**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 9/3/96**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.                                                    No. 95-5156

ALBERT OTIS DAVIS,

  Defendant-Appellant.

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 94-CR-179-K)**

---

Stephen J. Greubel, Assistant Federal Public Defender, Tulsa, Oklahoma (Stephen J. Knorr, Federal Public Defender, with him on the brief), for Defendant-Appellant.

Lucy O. Creekmore, Assistant United States Attorney, Tulsa, Oklahoma (Stephen C. Lewis, United States Attorney, with her on the brief), for Plaintiff-Appellee.

---

Before **EBEL**, **HOLLOWAY** and **HENRY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Defendant-Appellant Albert Otis Davis was convicted of one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), after he was stopped by police and found to be carrying a gun. Davis contends the district court should have suppressed the gun and his subsequent statements as the fruits of an unlawful detention because there was no reasonable suspicion to justify the investigative stop pursuant to which the gun was found. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse.

## I.

The following are the facts in this case as found by the district court: On December 20, 1993 at approximately 10:00 p.m., Tulsa police officers Yelton, Spitler and Staats were patrolling the area of 1900 North Madison in Tulsa, Oklahoma. The Tulsa Police Department on prior occasions had received complaints regarding gunshots being fired in that area. One building in the area was known to the Tulsa Police Department as a "juice joint," i.e., a business that sells liquor without a license. Officer Yelton testified at the suppression hearing that the building had been known as a "juice joint" for the ten years he had served as a police officer, but that legal activities such as dominoes and pool also take place there. Officer Yelton testified that in the past he had investigated two shootings in the

area and had been involved in eight arrests in the area relating to drug sales and/or gun use. Officer Yelton also testified that gangs, such as the Crips and the Bloods, "hang out" and sell drugs at this location and that it had been the scene of gang disputes.

On the night and at the time in question, the three officers arrived in a marked police car and observed a brown Monte Carlo with four occupants parked just north of the "juice joint." Upon the officers' arrival, one of the occupants, Defendant Albert Otis Davis, exited the Monte Carlo. As he did so, he made eye contact with Officer Yelton, then broke eye contact and began walking toward the establishment with his hands in his pockets. Officer Yelton knew Davis was an ex-convict who had been acquitted of a gang-related homicide. Officer Yelton also knew Davis was associated with a gang, and had received information that Davis had been selling narcotics. However, none of Officer Yelton's prior contact with criminal activity in the 1900 North Madison area had involved Davis.

The officers told Davis to stop and to take his hands out of his pockets, but Davis continued walking in the same direction and same manner. Officer Yelton testified that he was concerned at that point with officer safety and believed defendant might be hiding a firearm. Officer Yelton further testified that he believed defendant was about to enter the

- 3 -

"juice joint." Officer Yelton and Officer Staats approached Davis and each officer grabbed one of Davis' arms. The officers escorted Davis to the Monte Carlo and told him to place his hands on top of the vehicle. Instead, Davis entered the front seat of the vehicle, removed a firearm from his coat pocket, and threw the firearm into the back seat of the vehicle. The officers recovered the firearm from the back seat and arrested Davis. Davis was taken to the police station, where he was read his Miranda rights, signed a waiver of those rights, and made a written statement.

## II.

On appeal from the denial of a motion to suppress evidence, we review the evidence in the light most favorable to the government, and we review the district court's findings of fact only for clear error. United States v. Lambert, 46 F.3d 1064, 1067 (10th Cir. 1995). We review de novo, however, the district court's conclusion as to whether the officers had reasonable, articulable suspicion of criminal activity at the time of the seizure. Id.; Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996).

## A.

According to the Supreme Court, there are three types of police-citizen encounters:

(1) consensual encounters which do not implicate the Fourth Amendment, see, e.g., Michigan v. Chesternut, 486 U.S. 567, 574-76 (1988); INS v. Delgado, 466 U.S. 210, 218-21 (1984); (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, see, e.g., United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968); and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause. See, e.g., Hayes v. Florida, 470 U.S. 811, 815-16 (1985); Dunaway v. New York, 442 U.S. 200, 212-16 (1979).

United States v. Bloom, 975 F.2d 1447, 1450-51 (10th Cir. 1992), overruled in part on other grounds, United States v. Little, 18 F.3d 1499, 1504 n.5 (10th Cir. 1994). The government argues that the encounter between the Tulsa police officers and Davis was a lawful investigative detention. "A seizure by means of an investigative detention 'is constitutional only if supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" Lambert, 46 F.3d at 1069 (quoting United States v. Ward, 961 F.2d 1526, 1529 (10th Cir. 1992) (quoting Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam))). An officer who "stops" and briefly detains a person for questioning "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392

U.S. 1, 21 (1968). While an investigative detention does not require probable cause, it does demand "something more than an inchoate and unparticularized suspicion or 'hunch.'" United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994) (internal quotation marks omitted). In the course of a valid investigative detention, an officer may conduct a limited protective search ("frisk") if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous. United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1993); United States v. Santillanes, 848 F.2d 1103, 1108 (10th Cir. 1988).

According to the government, the officers in this case possessed reasonable and articulable suspicion that Davis was engaging in criminal activity based on the following four factors: (1) Davis' car being parked outside a known criminal establishment; (2) Davis' actions in exiting the car when he saw the officers, making and then breaking eye contact, and refusing to stop when directed; (3) Davis' keeping his hands in his pockets; and (4) the officers' knowledge of Davis' prior criminal record. None of these factors, standing alone, provides a lawful basis for an investigative detention. First, "[t]he fact that [Davis] was in a neighborhood frequented by [criminals], standing alone, is not a basis for concluding that [Davis] himself was engaged in criminal conduct." Brown v. Texas, 443 U.S. 47,

52 (1979). Similarly, the fact that Davis was approaching a "juice joint" does not give rise to a reasonable suspicion that criminal activity was afoot, especially since the record shows that the establishment also offered legitimate activities to its patrons.

Davis' actions in exiting the car, making and then breaking eye contact with the officers, and then walking away from the officers also do not furnish the basis for a valid Terry stop. Looking at a police officer and then looking away does not provide the officer with "a particularized and objective basis for suspecting the person stopped of criminal activity," Ornelas, 116 S. Ct. at 1661(internal quotation marks omitted). See, e.g., Santillanes, 848 F.2d at 1105-08 (no reasonable suspicion when defendant, who had prior criminal record, spotted detective, veered away, and walked at an increased pace). Moreover, while an officer does not violate the Fourth Amendment simply by approaching an individual in a public place and asking him questions, the individual "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." Florida v. Royer, 460 U.S. 491, 497-98 (1983) (plurality opinion) (citing Terry, 392 U.S. at 32-33 (Harlan, J., concurring); id. at 34 (White, J., concurring)). Thus, Davis' refusal to stop when asked by the officer cannot justify his detention. See Royer, 460 U.S. at 498 ("[A

person] may not be detained even momentarily without reasonable, objective grounds for doing so; and [the person's] refusal to listen or answer does not, without more, furnish those grounds.").[1]

The fact that Davis had his hands in his coat pockets on a December night in Tulsa also does not justify an investigative detention. There was no evidence presented at the suppression hearing indicating that the officers possessed any particularized basis for suspecting that Davis was armed. Rather, Officer Yelton testified at the suppression hearing that his suspicion of Davis was based simply on his "perception" after ten years on the police force. Officer Yelton elaborated on what he meant by his "perception":

---

[1] There is some debate as to whether the officers' instruction to "stop" was an order which began the detention, or whether the officers' request was merely precatory. This issue would turn on whether the officers' telling Davis to stop "constituted a show of authority sufficient to make a reasonable person believe that he or she was not free to leave." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992). The district court did not address this issue, nor do we find it determinative of the question whether Davis' refusing to stop would provide the officers with reasonable suspicion. As stated in the text, if the officers' "request" was merely precatory, Davis' refusal to stop could not create reasonable suspicion for a Terry stop. Royer, 460 U.S. at 498. On the other hand, if the officers' request would have made a reasonable person feel that he or she was not free to leave, then the investigative detention began at exactly that point, and thus Davis' subsequent refusal to comply with the officers' order to stop could not furnish the basis for the earlier detention.

Well, again, the training by the Tulsa Police Department and what we teach is that we look at individuals and you size them up, basically looking at them. <u>And your perception is basically 90 percent what you feel</u>.

R.O.A., Vol. III at 41 (emphasis added). Officer Yelton acknowledged the lack of any particularized basis reasonably to suspect that Davis was in the process of committing a crime:

> Q. On that evening, you had no information to indicate that Mr. Davis was in possession of a firearm; is that correct?
> A. That's correct.
> Q. And you had no information indicating that he was about to distribute narcotics of any kind?
> A. No.
> Q. And you had no suspicion of any law violation?
> A. No.

<u>Id.</u> at 37-38. Absent a specific and articulable factual basis, an officer's "perception" is nothing more than "an inchoate and unparticularized suspicion or 'hunch,'" <u>Melendez-Garcia</u>, 28 F.3d at 1051 (internal quotation marks omitted), which cannot furnish the basis for an involuntary detention.

Finally, the fact that the officers were aware of Davis' criminal record does not justify the stop: Knowledge of a person's prior criminal involvement is not, standing alone, sufficient to create reasonable suspicion. <u>United States v. Sandoval</u>, 29 F.3d 537, 542 (10th Cir. 1994).

Even if these factors standing alone would not justify a Terry stop, the government urges us to uphold the detention because it argues that these four factors, when taken together, created a reasonable suspicion of criminal activity. See United States v. Sokolow, 490 U.S. 1, 8-10 (1989) (reasonable suspicion depends on "the totality of circumstances--the whole picture"; even if any one factor alone is insufficient to justify a stop, taken together they may suffice). The district court agreed with this argument, concluding that Davis' evasive attitude (walking away from police, dropping eye contact and keeping his hands in his pockets) in the context of his criminal history and the high crime area gave rise to reasonable suspicion. We disagree. An investigative detention will be countenanced only if the officers have a specific, articulable and objective factual basis to believe that the person stopped is engaged in criminal activity. Even considering the totality of the circumstances in this case, the government fails to show any specific factual basis for suspecting that a particular crime was being committed by Davis at the time he was detained. The government argues that the officers reasonably suspected that Davis was unlawfully carrying a firearm. However, there is no evidence whatsoever to support such a suspicion. There was no evidence that the officers spotted a suspicious bulge in Davis' coat pockets, that Davis appeared to be

hiding anything in his pockets, that a tipster informed police that Davis was armed or carrying drugs, or that Davis made any threatening move towards the officers. Here, the factual findings of the district court indicate that when Davis was instructed by the officers to stop, "he continued walking in the same direction and same manner." (Emphasis added.) There was a similar lack of any evidence that Davis was in the process of engaging in an illegal drug or alcohol transaction. On the present record, therefore, we hold that the officers lacked the necessary "reasonable, articulable suspicion" to justify their detention of Davis.

**B.**

The district court also concluded that because Davis himself removed the gun from his pocket and threw it onto the back seat of the vehicle, the weapon was in "plain view" and thus the officers' seizure of the gun did not violate the Fourth Amendment. See United States v. Hensley, 469 U.S. 221, 235 (1985) (upholding seizure of evidence in plain view of officers during a Terry stop). However, "[t]he first and most fundamental prerequisite to reliance upon plain view as a basis for a warrantless seizure . . . is that 'the initial intrusion which brings the police within plain view of such an article' is itself lawful." 3 Wayne R. LaFave, Search and Seizure:

A Treatise on the Fourth Amendment § 7.5(a), at 575 (1996) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971)). "The [plain view] doctrine serves to supplement the prior justification--whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused." Coolidge, 403 U.S. at 466. Here, Davis' act of removing the firearm from his coat and placing it in plain view was a direct result of his unlawful detention. Compare Hensley, 469 U.S. at 235 ("[The] police were entitled to seize evidence revealed in plain view in the course of the lawful stop. . . .") (emphasis added). Because Davis' detention was unlawful, and because this illegality caused the evidence to be placed in plain view, the government cannot rely on the plain view doctrine to justify the seizure of the firearm.

## III.

For the foregoing reasons, the judgment of the district court is

**REVERSED** and **REMANDED** for further proceedings consistent with this

opinion.