**UNITED STATES COURT OF APPEALS**
**Filed 12/20/96**
**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOHN BRADLEY NICHOLAS,

      Defendant-Appellant.

No. 96-4022
(D.C. No.94-CR-3)
(District of Utah)

**ORDER AND JUDGMENT**[1]

Before **PORFILIO**, **HOLLOWAY**, and **BRISCOE**, Circuit Judges.

Defendant appeals the district court's decision denying his motion to suppress evidence seized during the course of a traffic stop. Following the court's ruling, defendant entered a conditional guilty plea to possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and receipt of a firearm by a restricted person in violation of 18 U.S.C. § 922(n). On appeal, defendant argues the police officers' conduct violated the Fourth Amendment because it was not justified at its

---

[1]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

inception and was not reasonably related in scope to the surrounding circumstances. We believe the record fails to support the district court's finding the defendant's initial stop was reasonable and reverse.

At 5:30 am on December 19, 1993, Officer Lance London, patrolling in the city of South Ogden, Utah, noticed a car parked in the lot of an all-night bowling alley. He observed a passenger exit from the car and wave his arms in the air. As Officer London pulled into the parking lot, the passenger put something on the ground, leaned into the car to speak to the driver, then shut the car door and walked into the bowling alley. Officer London circled the parked car and noted the object on the ground was a beer can, but did not see whether the can was open or closed.[2] London also noted that the driver, defendant John Bradley Nicholas, sat still and kept his head forward until the officer had driven past. As the officer parked and got out of his car, Mr. Nicholas drove out of the lot, making a proper stop at the exit and a lawful right turn onto the street. Officer London followed and pulled Mr. Nicholas over to the curb a short distance from the lot. Officer London described the stop in this testimony:

Q. Okay. Officer London, what did you stop the vehicle for?

A. I thought it likely that the *driver* may have been drinking.

Q. And *what factors did you observe that led you to believe that*?

---

[2]An officer retrieved the can after Nicholas's arrest; the can was closed.

A.     Well, I saw what I believed was ***someone getting out of the car*** with what I thought to be an open container.

Q.     And ***was there anything about the behavior of either of the persons that gave you any suspicion?***

A.     Well, I noticed ***the passenger*** acting strangely but the driver just -- I thought it suspicious the way the driver didn't look at me just --

Q.     If he had looked at you would that make you suspicious?

A.     Well, not necessarily.  It just -- ***the driver seemed nervous*** about me being there.

Q.     What was in your mind?  What was the reason you pulled the vehicle over?

A.     ***I thought the driver may have been drinking.***

(emphasis added).

As Officer London approached, Mr. Nicholas opened the driver's side door and asked the officer why he had been stopped.  The officer replied he had seen a passenger exit the car with a beer and wondered if Mr. Nicholas had been drinking.  If there was a reply to the question, the officer later testified he could not recall it.[3]

_____

[3]Utah law permits drivers to have closed containers of beer in their cars.  It is legal to drink from open containers of alcohol in parking lots but not on roadways.  Utah Code Ann. § 41-6-44.20 provides:

> (1) a person may not drink any alcoholic beverage while operating a motor vehicle or while a passenger in a motor vehicle, whether the vehicle is moving, stopped, or parked on any highway; (2) a person may not keep,

(continued...)

Thereafter, events took place that are unnecessary to reiterate here save to note searches of the vehicle occurred leading to the production of evidence supporting the charges filed against the defendant. We need not detail either the events or the products of the searches because the stop is key to what followed. Indeed, because of the testimony of Officer London, the entire case revolves about the validity of the initial stop.

A traffic stop constitutes a seizure within the meaning of the Fourth Amendment; for purposes of constitutional analysis, it is characterized as an investigative detention rather than a custodial arrest. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995), *cert. denied*, 116 S.Ct. 2529 (1996). An investigative detention must be based upon "'specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion.'" *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Reasonable

---

[3](...continued)
carry, possess, transport, or allow another to keep, carry, possess, or transport in the passenger compartment of a motor vehicle, when the vehicle is on any highway, any container which contains any alcoholic beverage if the container has been opened, its seal broken, or the contents of the container partially consumed.

Utah law does not specifically forbid a person from driving after having consumed alcoholic beverages. Utah Code Ann. § 41-6-44(2) provides:

(a) A person may not operate or be in actual physical control of a vehicle within this state if the person: (i) has a blood or breath alcohol concentration of .08 grams or greater . . . or (ii) is under the influence of alcohol, any drug, or the combined influence of alcohol and any drug to a degree that renders the person incapable of safely operating a vehicle.

suspicion is determined by the totality of the circumstances, *id.; United States v. Barbee*, 968 F.2d 1026, 1028 (10th Cir. 1992); but to justify the stop, the detaining officer must have a reasonable articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity. *United States v. Nicholson,* 983 F.2d 983, 987 (10th Cir. 1993). An officer's unparticularized suspicion or hunch cannot create circumstances giving rise to reasonable suspicion. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994).

We review findings of fact related to a motion to suppress in a light most favorable to the government and set aside those findings only when clearly erroneous. *United States v. Davis*, 94 F.3d 1465, 1467 (10th Cir. 1996). We review *de novo,* however, the district court's conclusion an officer has a reasonable, articulable suspicion of criminal activity at the time of the seizure. *Id.* This review is in two steps. First, we determine whether the officer's action was justified at its inception; then, whether the action was reasonably related in scope to the circumstances which justified the interference in the first place. *Lee*, 73 F.3d at 1038; *Botero-Ospina*, 71 F.3d at 786. A traffic stop is justified at its inception if "this particular officer has reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Botero-Ospina* at 71 F.3d at 787 (citations omitted).

The district court's conclusion Officer London had reasonable suspicion was based upon five factors: (1) the incident occurred early in the morning; (2) the passenger made

strange gestures when he exited the car; (3) the passenger placed a beer can on the ground; (4) the defendant did not make eye contact with Officer London, and; (5) the defendant drove out of the parking lot as the officer parked and started to get out of his car. While reasonableness of the officer's conduct is assessed using a totality of the circumstances test, examination of each factor is useful because "[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Lee*, 73 F.3d at 1039.

The time of the incident has little relevance in this analysis. Mr. Nicholas's car was parked in the lot of an establishment that was open for twenty-four hours each day. It is reasonably inferable the business maintained those hours because enough customers frequented it late at night and early in the morning to make its hours of operation appropriate. Had defendant's car been spotted in the lot of an abandoned building, or at least a closed business, the district court's consideration of the time of day to shroud the incident in suspicion would have been more logical. Second, the connection between the early hour and the likelihood of Mr. Nicholas's intoxication is counter-intuitive. The time of day might be important if Officer London suspected Mr. Nicholas of falling asleep at the wheel, or even of engaging in general malfeasance, but the government offers the early morning hour as evidence to support London's particular suspicion that Nicholas had been drinking. Because the government presented no testimony to explain the basis

for this inference, we fail to understand why it is more likely that Mr. Nicholas would have been drinking beer at 5:30 am than at another time of day.

Of equal concern is the evidentiary value of the passenger's odd gestures and possession of a beer. Albeit those facts might have provided Officer London with reasonable suspicion that the <u>passenger</u> had been drinking, but he did not explain, nor can we see, how those acts or any of the passenger's other acts form a constitutionally-sound basis for believing <u>defendant</u> had been drinking. Indeed, courts have long recognized that an individual's mere proximity to questionable or illegal conduct does not imply involvement in that conduct, and may not be used to justify police intrusion. *See **Sibron v. New York***, 392 U.S. 40, 62-63 (1968) (defendant's interaction with known drug addicts over period of eight hours did not create probable cause for officer's subsequent search and seizure); ***Ybarra v. Illinois***, 444 U.S. 85, 91 (1979) ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . [w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person"); ***Brown v. Texas***, 443 U.S. 47, 52 (defendant's presence in neighborhood frequented by drug users and officer's contention that situation "looked suspicious" did not support finding of reasonable suspicion to stop defendant; specific, objective facts must indicate that particular individual involved in illegal activity).

The government interprets Nicholas's failure to make eye contact with the officer as nervous behavior, presumably suggesting a guilty conscience. This argument is supported neither by logic nor by case law. Involuntary contact with a police officer will often elicit some feeling of anxiety in a law-abiding citizen. Here, Officer London slowly circled Mr. Nicholas's parked car and then stopped directly behind him without indicating any purpose or reason for his interest. We believe it quite appropriate that Mr. Nicholas would feel some wariness or apprehension in that situation.

Moreover, we have acknowledged that nervousness seldom serves as a reliable factor in determining whether an officer's conduct was justified. In **Fernandez**, we reminded:

> We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on the nervousness of either the driver or passenger as a basis for reasonable suspicion in all cases of this kind must be treated with caution.

**Id.** at 879 (citation omitted). Furthermore, in **Barbee**, we specifically discounted avoidance of eye contact as suspicious behavior: "[S]uch behavior [passengers sinking down below seat level] is suspicious conduct not clearly susceptible to unsuspicious interpretations, unlike passengers merely avoiding eye contact . . . ." **Id.** at 1029.

Interestingly, Officer London's testimony reveals the unreliability of this factor. Although he stated that Mr. Nicholas's lack of eye contact raised his suspicion, he almost

- 8 -

immediately contradicted himself by conceding that had Mr. Nicholas looked at him instead, Officer London might have found that suspicious as well.[4]

The government argued, and the district court accepted, that Mr. Nicholas's departure from the parking lot after the officer pulled up behind him constituted suspicious behavior, suggesting that act was viewed as an attempt to evade the officer. Yet, defendant's actions were not consistent with that theory. Mr. Nicholas left the parking lot just after his passenger exited from the car and entered the bowling alley. Officer London did not turn on his emergency lights, call out, or indicate in any other way that he expected Mr. Nicholas to remain in the parking lot. Nicholas did not speed out of the lot, and he pulled to the side of the road as soon as London signaled him to stop. Indeed, Officer London did not testify that defendant's departure from the parking lot was unwarranted in any way.

This court already has refused to characterize as evasion conduct seemingly more suspicious than that of Mr. Nicholas. The driver in *Fernandez*, for example, pulled into the emergency lane after noticing a police officer following him. After a quarter mile, the officer pulled into the lane behind him but did not activate his lights. The driver reentered traffic, and the officer switched lanes again and stopped the car. We rejected

---

[4]The Ninth Circuit has remarked that the phenomenon of allowing both eye contact and avoidance of eye contact to qualify as suspicious behavior "put[s] the officers in a classic 'heads I win, tails you lose' position." *United States v. Garcia-Camacho*, 53 F.3d 244, 247 (9th Cir. 1995).

the government's argument that the driver's conduct constituted evasion, emphasizing that the driver pulled over promptly when signaled by the officer. *Fernandez*, 18 F.3d at 878-79.

In reliance upon *Terry,* the government argues while each factor independently constitutes entirely innocent behavior, all the factors taken together transform the situation into veritable opprobrium. But this is not a case like *Terry*, where the defendants' actions could *only* be understood when examined as a series of interconnected events. Instead, Nicholas's conduct was appropriate at each separate step as well as within the context of the overall situation. While acknowledging a totality of the circumstances test governs this analysis, we cannot discount completely the fact that none of the individual factors supports a specific, particularized suspicion Mr. Nicholas was committing a crime.

Several additional considerations offset the factors relied upon by the government and the district court. First, Officer London had no prior contact with Mr. Nicholas and had no basis to evaluate his demeanor or the likelihood that he would be drinking at a rather unusual time of day. *See United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir. 1992) ("we do not understand how Agent Ochoa would know whether defendant was acting nervous and excited or whether he was merely acting in his normal manner"), *overruled on other grounds United States v. Little*, 18 F.3d 1499 (10th Cir. 1994).

Second, Officer London had not received a tip or information from another law enforcement officer that Mr. Nicholas might be engaging in illegal activity. *See **Adams v. Williams***, 407 U.S. 143, 146 (1972) (reasonable suspicion to stop and frisk defendant supported by receipt of tip); ***Nicholson***, 983 F.2d at 987 (reasonable suspicion supported by information and description received from other police officers).

Third, Officer London testified he stopped Mr. Nicholas because he believed he might have been drinking. Consumption of alcohol by persons over the age of twenty-one is not a crime; therefore, Officer London, must have meant he stopped Mr. Nicholas because he suspected he was driving under the influence of alcohol. However, Officer London was unable to recall Mr. Nicholas's response to his specific question, whether he had in fact been drinking, and did not provide any evidence other than his hunch that such was the case. He did not, for example, attempt to substantiate that hunch by performance of field sobriety tests. *See **Fernandez***, 18 F.3d at 881 (finding detention exceeded proper scope and noting officer "administered no roadside sobriety tests; did not request the defendant submit to blood, breath, or urine tests; and issued no citation for driving while impaired").

Furthermore, Officer London described no driving pattern that might support an inference that Mr. Nicholas was driving under the influence of alcohol. Yet, we have consistently relied upon evidence of improper operation of a vehicle to uphold the validity of a traffic stop. *See **Lee***, 73 F.3d at 1038 (straddling lane and lane change supported

- 11 -

reasonable suspicion that driver was sleepy or intoxicated; initial stop valid); ***Botero-Ospina***, 71 F.3d at 788 (traveling under speed limit and straddling lane supported reasonable suspicion driver impaired); ***King***, 990 F.2d at 1561 (incessant honking at scene of accident provided justification to detain driver to inform and advise of conditions; initial stop valid). *But see* ***Barbee***, 968 F.2d at 1029 (listing six factors, but none a moving violation, to support federal agent's reasonable suspicion illegal immigrants were riding in vehicle).

The evidence in this case simply does not support a determination that at the time of the initial stop Officer London had reasonable, particularized suspicion Mr. Nicholas had committed or was committing a crime. The traffic stop, therefore, violated defendant's Fourth Amendment rights. ***Davis***, 94 F.3d at 1468-70. Although the events occurring after the stop demonstrated Mr. Nicholas was in apparent violation of the law, we must constantly remind ourselves a seizure is not made valid by what a subsequent search produces. The judgment of the district court is **REVERSED,** and the cause is **REMANDED** with instructions to vacate the conditional plea.

**ENTERED FOR THE COURT**

**John C. Porfilio**
**Circuit Judge**