**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 16 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

BRIAN KEITH ASHCRAFT,

      Defendant - Appellant.

No. 96-3329

(D. Kansas)

(D.C. No. 95-CR-40089-002)

---

**ORDER AND JUDGMENT**[*]

---

Before **ANDERSON**, **HENRY**, and **BRISCOE**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Brian Keith Ashcraft pleaded guilty to possession of cocaine with intent to distribute, reserving the right to appeal the district court's denial of his pretrial motion to suppress certain evidence. We affirm.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

At 9:14 a.m. on November 9, 1995, Deputy Laurie Fletcher and Deputy Donald Matthews of Miami County Sheriff's Department in Kansas were on routine patrol when they received a dispatch call advising them that a school bus driver had reported an abandoned vehicle in a rural part of the county. Dispatch informed them that the vehicle was a black Corvette which had an out-of-county tag and appeared damaged. The officers drove to the scene, arriving at 9:32 a.m. As the officers approached the Corvette, they saw two men. Deputy Fletcher testified that both men were in the car, while Deputy Matthews testified that he recalled that the driver was in the Corvette and the passenger was outside the car and then got in the car.

The officers passed the Corvette, turned around, and pulled up behind it. As the patrol car pulled up, the Corvette pulled away from the curb. The officers followed, without engaging their lights or siren, and the Corvette voluntarily pulled over to the side of the road. The officers testified that given the report that the vehicle had been abandoned, they were now concerned that it might be stolen. The officers called the license plate number into dispatch to run a registration check. Deputy Matthews approached the driver's side and asked the driver, Ricky Gene Powell, "what was going on." R. Vol. II, at 181. Mr. Powell told Deputy Matthews that he and the passenger, Mr. Ashcraft, had been in Kansas City and

that they were driving back to Iola when they grew tired and pulled over to take a nap. Deputy Fletcher testified that this story seemed somewhat suspicious because "[i]t was 9 o'clock in the morning, it would have been an unusual time for a person to become drowsy driving. The distance that they were going would have been a normal distance to drive within a day." Id. at 71-72. Furthermore, the men were "off the beaten path" according to their travel plans. Id. at 73.[1]

Deputy Matthews asked both men for identification and then went back to his patrol car. Deputy Matthews testified that by this time dispatch had informed him that the car was registered to Mr. Powell. He then contacted dispatch to "run all the regular NCIC checks and everything on them." Id. at 181. As Deputy Matthews was running the checks, Sergeant Charles McCleur arrived in his canine unit. His vehicle was marked with red lettering on a white background on both back passenger doors, cautioning that it was a canine unit. Sergeant McCleur approached the Corvette and the patrol car head on, drove past both vehicles, and turned around and parked behind the patrol car. As he passed the Corvette, Mr. Powell and Mr. Ashcraft reacted as follows:

---

[1]Deputy Fletcher's testimony on this point is as follows:
Q. The vehicle then to get back to 169 would have had to have traveled--
turn a U-turn and gone east on 335th to Cedar Niles and then go north?
A. Correct.
Q. So it's off the beaten path?
A. Yes.
R. Vol. II, at 73.

> They turned to each other, they were making hand motions. It appeared that they were talking, communicating with each other. There was ahead [sic] movement, there were hand movements. And they also both bent down as if reaching to the sides of the vehicle or to the floor panels. . . . Yeah, they were--they were moving towards the floorboards, towards the side panels and under the--the seats. And one movement was to the back, also, behind the seats.

Id. at 37 (testimony of Deputy Fletcher). Sergeant McCleur testified that he believed the men might be reaching for weapons. Accordingly, Sergeant McCleur, who was the on-duty supervisor, instructed Deputy Matthews to assist him in escorting the men out of the car for a pat down search for weapons.[2]

---

[2]There is some dispute regarding whether dispatch had conveyed the results of the computer checks prior to or after the pat down searches. Deputy Fletcher testified:
> Q. You determined that Mr. Powell was lawfully in possession of the vehicle. Is that right?
> A. Yes, we did.
> Q. Prior to its being searched?
> A. I'm not exactly sure when the radio contact was made. Everything happens pretty much at the same time. The decision to ask the subjects to step out of the vehicle was made after we had radioed in for information on the vehicle and on the identification. Some of that information had come back and some of it had not come back yet. So that was still questionable at that point in time.
> Q. Well, what time did you get the information back on the registration of the car?
> A. I'm not sure of the exact moment, but it was during the--the point in time when--when we had them out of the vehicle and when--after the pat search was being conducted.

R. Vol. II, at 78-79. Deputy Matthews' testimony differed somewhat. He stated that after he obtained identification from the men and returned to his patrol car, dispatch had already reported that the vehicle was registered to Mr. Powell. He then contacted dispatch to begin running computer checks on the men's identification, including "wants and warrants." Id. at 184, 200. Deputy Matthews testified that while he was running the other computer checks, Sergeant McCleur drove up in his canine unit. Id. at 202-03.

-4-

As Deputy Matthews and Sergeant McCleur pat searched the men, Deputy Matthews identified an object in Mr. Powell's pocket and asked him what it was. Mr. Powell responded that the object was money and then reached into his pocket and pulled out a large wad of money rolled up and held together with a rubberband.[3] Deputy Matthews put the money in his pocket. The officers then secured the men in separate patrol cars.

Sergeant McCleur testified that he was "still concerned about what had been going on in the vehicle, so [he] went back to [his] patrol vehicle and got [his] canine." Id. at 148-49. Sergeant McCleur led the dog along the passenger side of the Corvette and the dog alerted that drugs were present. Deputy Fletcher testified that from the time Deputy Matthews found the money on Mr. Powell until Sergeant McCleur conducted the dog sniff was less than a minute, while Deputy Matthews testified that it was "maybe a couple minutes." Id. at 190. Sergeant McCleur then asked the men why they were at that location. The men said that they had been in Kansas City looking for car parts and on their return trip they grew tired and pulled over to sleep. Sergeant McCleur asked Mr. Powell for permission to search the car and he refused. The officers then searched the car and found paraphernalia and narcotics. Deputy Matthews arrested the men at

---

[3]Officers later determined that Mr. Powell had $4,397.00 in this wad of money.

9:49 a.m., seventeen minutes after the officers arrived at the scene.[4]  The officers

conducted a more thorough search of the Corvette and found more drugs,

paraphernalia, money, and guns.  Mr. Powell and Mr. Ashcraft were taken to the

police station, read their Miranda rights, and interviewed.

A grand jury indicted Mr. Ashcraft and Mr. Powell on several counts

related to this incident.  Mr. Powell filed a motion to suppress evidence seized

from the Corvette and statements made to the police.  Mr. Ashcraft moved to join

the motion.  The district court held an evidentiary hearing on April 5, 1996.  The

district court allowed Mr. Ashcraft to join Mr. Powell's motion, but denied the

motion to suppress evidence.  Mr. Ashcraft pleaded guilty to possession with

intent to distribute cocaine, reserving the right to appeal the denial of the motion

to suppress.  Mr. Ashcraft was subsequently sentenced to fourteen months'

imprisonment.


## II.

Mr. Ashcraft argues that the district court erred in denying his motion to

suppress because the "investigative detention was not supported by a reasonable

---

[4]The undisputed testimony is that the men were arrested at 9:49 a.m.  However, Deputy Matthews testified that he arrested the men after the positive dog sniff, but before the car was searched.  Based on other testimony, the district court found that the men were arrested after the initial car search.

suspicion of criminal activity because it exceeded the scope of the initial intrusion which was to satisfy the officers that the vehicle was lawfully occupied." Appellant's Br. at 2. Specifically, Mr. Ashcraft contends that (1) although the officers were justified in checking the men's identification to determine if they were in valid possession of the vehicle, the officers exceeded the purpose of the detention when they held the documents to run a warrants check, (2) the officers exceeded the proper scope of the detention when they frisked the men and conducted a dog sniff, and (3) Mr. Ashcraft's subsequent statements must be suppressed as fruits of the illegal detention.

"When reviewing the denial of a motion to suppress evidence, we view the evidence in the light most favorable to the government and the district court's findings, and we review the district court's factual findings only for clear error." United States v. Anderson, ___ F.3d ___, 1997 WL 287031, at *3 (10th Cir. May 30, 1997). We review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment. Id.

The Supreme Court has defined three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures and must be supported by reasonable articulable suspicion of criminal activity; and (3) arrests, which are the most intrusive Fourth Amendment seizures and must be supported

by probable cause.  United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996).

It is settled that a seizure does not occur simply because a police officer approaches an individual and asks questions.  United States v. Lambert, 46 F.3d 1064, 1067 (10th Cir. 1995) (citing Florida v. Bostick, 501 U.S. 429, 434 (1991)). If a reasonable person would feel free to terminate the encounter, the encounter is consensual and the Fourth Amendment is not implicated.  Id. at 1067-68. Moreover, a consensual encounter does not become an investigative detention just because the officer requests to examine an individual's driver's license or other documentation.  Florida v. Royer, 460 U.S. 491, 501 (1983); United States v. Mendenhall, 446 U.S. 544, 555 (1980); Lambert, 46 F.3d at 1068.  However, a consensual encounter ordinarily does become an investigative detention once the officer retains such documentation because the individual will not reasonably feel free to terminate the encounter.  Lambert, 46 F.3d at 1068; United States v. McRae, 81 F.3d 1528, 1534 n.3 (10th Cir. 1996) (traffic stop context); United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993) (traffic stop context).

In this case, Mr. Ashcraft properly concedes that the initial encounter between him and the officers was consensual.  During this consensual encounter, Deputy Matthews asked "what was going on," and Mr. Powell described the men's travel plans and explained that they had grown tired and pulled over to take

a nap. Deputy Matthews then asked for the men's identification and took the identification back to his patrol car to contact dispatch. The officers did not return Mr. Powell's driver's license or Mr. Ashcraft's identification at any time during the road-side encounter. Under these facts, we conclude that a reasonable person would not feel free to leave. Accordingly, when Deputy Matthews retained the identification, the consensual encounter escalated into an investigative detention which must have been supported by reasonable articulable suspicion in order to be lawful.

An investigative detention "must be justified at its inception and . . . must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" Anderson, 1997 WL 287031, at *4 (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). In evaluating whether an officer possesses reasonable articulable suspicion to support an investigative detention, we judge the officer's conduct in light of common sense and ordinary human experience. McRae, 81 F.3d at 1534. "Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994), but rather to determine whether the totality of the circumstances justify the detention. McRae, 81 F.3d at 1543. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances,

id., remembering that reasonable suspicion represents a "minimal level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted).

Applying these standards, we conclude that the officers had reasonable articulable suspicion to justify escalating the consensual encounter into an investigative detention. First, dispatch had reported to the officers that the Corvette was abandoned and yet when they arrived at the scene Mr. Powell was driving it and Mr. Ashcraft was a passenger. The officers were reasonably suspicious that the car may have been stolen. Additionally, during the initial consensual encounter, the officers became suspicious about the men's travel plans and location. See McRae, 81 F.3d at 1535 (contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity). Thus, the officers were entitled to further detain the men to investigate these concerns.

Mr. Ashcraft acknowledges that the officers were entitled to detain the men "to determine if the vehicle was properly in the possession of the occupants." Appellant's Br. at 19. However, he contends that once dispatch informed the officers that the Corvette was registered to Mr. Powell and the officers noted that that name matched the name on Mr. Powell's driver license, the officers knew Mr. Powell was lawfully in possession of the Corvette and no further detention was

justified. Mr. Ashcraft maintains it was unlawful for the officers to detain the men while they ran further computer checks.

In the analogous situation of a routine traffic stop, we have held that an officer conducting computer checks on the driver's license and the vehicle registration papers, may also run checks regarding whether the driver has any outstanding warrants or the vehicle has been reported stolen. United States v. Mendez, ___F.3d___, 1997 WL 374163, at *3 (10th Cir. July 8, 1997); McRae, 81 F.3d at 1535 n.6. In the present case, the officers' suspicions regarding whether the vehicle was stolen were largely dispelled when dispatch informed them that the Corvette was registered to Mr. Powell. However, the officers had not received the results of the other computer checks and still had not resolved their concerns about the men's suspicious travel plans and location. The district court found that at the time the officers asked the men to exit the Corvette in order to conduct the pat down searches, the officers "had not verified all of the information provided by the defendants." R. Vol. I, Tab 49, at 13-14. This finding is supported by the record and is not clearly erroneous. Accordingly, the officers were entitled to continue detaining the men at least long enough to receive the results of the computer checks that are allowed in a routine traffic stop.

It is undisputed that while the officers were waiting for the results of at least some of these computer checks, Sergeant McCleur arrived in his vehicle which is marked as a canine unit. Mr. Ashcraft and Mr. Powell reacted by reaching to the sides, to the floor panels, under the seats, and behind the seats of the Corvette. During an investigatory detention, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo. United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996); United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994). Such action may include a request for the driver and passengers to step out of the car. Maryland v. Wilson, 117 S. Ct. 882, 886 (1997). Officers may also conduct a limited protective search or frisk if the officers harbor a reasonable and articulable suspicion that the detainees are armed and dangerous. Davis, 94 F.3d at 1468. After observing the men's activity, the officers were entitled to frisk the men to insure that they did not have weapons.

Following the pat searches, the officers had more reasons to be suspicious of the men's activities. First, the officers had observed the men reaching around inside the Corvette as Sergeant McCleur drove by in his clearly marked canine unit. These observations could contribute to experienced law enforcement officers' reasonable suspicion that the men may have been retrieving guns or hiding contraband. Although the officers' pat down searches revealed no

-12-

weapons, such a search did not resolve whether the men had hidden contraband. Furthermore, the officers now knew that Mr. Powell was carrying a large sum of money. This factor could also reinforce the officers' reasonable suspicion of drug activity.

The officers' still unresolved concerns about Mr. Powell's and Mr. Ashcraft's travel plans and location, as well as their suspicions regarding the men's furtive movements in the Corvette and Mr. Powell's large wad of money provided reasonable articulable suspicion to support a continued investigative detention. Following the pat down searches, the officers secured the men in separate patrol cars and Sergeant McCleur took one to two minutes to conduct the dog sniff. When officers have lawfully detained a vehicle, a dog sniff is not a search within the meaning of the Fourth Amendment. Romo v. Champion, 46 F.3d 1013, 1018 (10th Cir.), cert. denied, 116 S. Ct. 387 (1995); United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993). After the dog alerted to the presence of drugs, Sergeant McCleur asked the men more questions about why they were at that location and asked Mr. Powell for consent to search the Corvette, which he refused. However, because the officers had probable cause to search based on the dog's alert to the presence of drugs, see United States v. Massie, 65 F.3d 843, 849 (10th Cir. 1995); Romo, 46 F.3d at 1020, Ludwig, 10 F.3d at 1527, the officers searched the Corvette, found drugs and paraphernalia,

and arrested the men. Seventeen minutes elapsed from the time the officers arrived at the scene until the men were arrested. We conclude that this brief detention was reasonable to investigate the officers' suspicions.

Mr. Ashcraft's final argument is that because the investigative detention was illegal, the subsequent incriminating statements must be suppressed as fruits of the illegality. However, because we conclude that the investigative detention was justified, this argument has no merit.

## III.

For the foregoing reasons, we AFFIRM the denial of Mr. Ashcraft's motion to suppress.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge