**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**vs.**
**GLEN R. SMITH, Defendant**

Criminal No. ST-07-CR-487

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

March 5, 2008

COURTNEY REESE, ESQUIRE, Assistant Attorney General, Department of Justice, St. Thomas, VI, *Counsel for Plaintiff.*

JULIE SMITH TODMAN, ESQUIRE, Office of the Territorial Public Defender, St. Thomas, VI, *Counsel for Defendant.*

CARROLL, *Judge*

## MEMORANDUM OPINION AND ORDER

(March 5, 2008)

**THIS MATTER** is before the Court on the Defendant's motion to suppress evidence on the grounds that it was obtained in violation of the Fourth Amendment by the Virgin Islands Police Department, and the

People's opposition thereto. The matter came on for hearing on February 19, 2008. The People were represented by Courtney Reese, Esq., Assistant Attorney General, and the Defendant was present and represented by Julie Smith Todman, Esq., Office of the Territorial Public Defender. After hearing testimony from witnesses, including several police officers and the Defendant, Glen R. Smith ("Smith"), the Court orally granted the Defendant's motion to suppress the marijuana seized from Smith's person, based on a violation by the police of Smith's Fourth Amendment rights. The Court directed the parties to submit briefs on the closer question of whether the crack cocaine that the police subsequently seized also should be suppressed. For the reasons set forth below, the Defendant's motion shall be granted, and the cocaine shall also be suppressed.

## FACTUAL BACKGROUND

On December 24, 2007, ten to twelve officers of the Special Operations Bureau of the Virgin Islands Police Department ("VIPD"), including Ecedro Lindquist, Jose R. Allen, Kendelth Wharton, and Angela Brown, conducted an inspection in the vicinity of Paul M. Pearson Gardens ("PMP") Building 11, St. Thomas, Virgin Islands. The police had received a report of gunshots being fired in the area the previous evening, and the St. Andrews Church van had been damaged by the bullets. The police action was part of a VIPD initiative called "Stop, Park, Walk and Talk," in which a group of officers conduct periodic inspections of high-crime areas on foot. During this action, according to testimony adduced at the hearing, most of the officers had their weapons drawn as they walked up through the rear of the PMP grounds by Building 11. The officers had their standard-issue .22 Glock handguns drawn, and some carried assault rifles as well. Officer Lindquist had his canine partner, a 98-pound Belgian Malinois dog, leashed, as he and Officer Allen walked through the grounds.

Officer Wharton testified that shortly after the officers arrived around 11:00 p.m. on Christmas Eve, he received a call on his radio that other officers had discovered a gun on the person of a suspect nearby on the PMP grounds. Officer Wharton broke off from Officers Lindquist and Allen to help detain the suspect. Several of the officers testified that this incident, though concededly not related to the Defendant, Glen R. Smith, put them on high alert as they continued the "Stop, Park, Walk and Talk" action.

232

A couple minutes later, Officer Jose R. Allen observed Smith sitting in a chair next to a back porch to the rear of Building 11. Allen testified that Smith was hunched over and appeared to be focused on whatever he had in front of him, but neither Allen nor Officer Lindquist could see what he was doing, nor could they see onto the back porch from their vantage point. During the hearing, Allen admitted that he did not observe any illegal activity by Smith or by anyone in the area, other than the person who had been found in possession of a gun about 25 feet away, who was not believed to be connected to Smith. Several other people who were in the area fled from the approaching police, but Smith remained where he was.

Lindquist called out to Smith, "Police K-9 unit, come out with your hands up!" Smith did not respond. Therefore, Officer Allen approached closer and shouted to Smith from about 20 feet away, "Hey you! Come out of there!" Allen had his gun drawn and pointed at Smith, who suddenly jumped out of his chair and began running toward Allen, waving his hands excitedly. When Smith kept running toward Allen despite Allen's directions that Smith should get on the ground, Allen took Smith to the ground and subdued him. Smith was asked whether he had any weapons or drugs on his person, and Smith stated no. Allen testified that he frisked Smith for the officer's safety. Allen felt a hard object in Smith's right rear pocket. Concerned that it might be a weapon, Allen removed the object from Smith's pocket and discovered it was a cellular phone. As the phone was removed, a small plastic bag of what appeared to be marijuana also fell out of Smith's back pocket. Allen informed Smith that he was under arrest. Allen testified that Smith then said, "You going to lock me up for a little dime bag of weed?" Allen repeated to Smith that he had the authority to arrest Smith because he was in possession of marijuana.

Meanwhile, Officer Angela Brown observed that Allen had Smith restrained on the ground. According to Brown's testimony, she went to inspect the area of the back porch where Allen indicated that Smith had been sitting. A photograph of the area was introduced into evidence at the hearing, although when Smith testified, he maintained that he was not near the back porch and he was not sitting in a chair. The photograph indicates a small chair just off the back porch, with a VCR on the steps of the porch just inches away from the chair. According to Allen, this is where Smith had been hunched over, focused on whatever was in front of him. The back porch is open to public view from the courtyard, but the

officers testified that they could not see the back porch or its contents from the vantage point where Smith was detained. Rather, it was necessary for Officer Brown to get very close to the back porch in order to see onto it. In fact, Brown stepped onto the back porch as part of her search of the area.

Brown testified that after she stepped onto the back porch, which was well lit by an overhead light, she observed several small bags of what appeared to be crack cocaine sitting on top of the VCR. Brown testified that the baggies of crack were in plain view on top of the VCR, and that it was not necessary for her to open any doors or enclosures to see the cocaine. Brown yelled to Allen, who was still restraining Smith in the yard, "It looks like some crack here." At that point, Allen informed Smith that he also was under arrest for possession of the crack cocaine.

## DISCUSSION

The Fourth Amendment is made applicable to the Virgin Islands pursuant to the Revised Organic Act of 1954, § 3, 48 U.S.C. § 1561, as amended by Pub. L. No. 90-496, § 11, 82 Stat. 841 (Aug. 23, 1968). *United States v. Charles*, 290 F. Supp. 2d 610, 614 n. 1 (D.V.I. 1999). Guaranteeing the right of United States citizens to be free from unreasonable searches and seizures, the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

■ Pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and subsequent cases, a police officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot. *Id.* at 30; *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)). An officer may also conduct a limited pat-down for weapons when he reasonably believes that the subject of an investigatory stop is armed. *Terry*, 392 U.S. at 27. If the officer's suspicion is without factual

foundation and articulable facts, however, reasonable suspicion is lacking, and no degree of good faith, hunch or intuition on the part of the officer can substitute for it. *E.g., United States v. Smith*, 799 F.2d 704, 707-08 (11th Cir. 1986).

■ A person has been "seized" within the meaning of the Fourth Amendment when, taking into account all of the circumstances surrounding the encounter, the police conduct "would have communicated to a reasonable person" that he was not free "to ignore the police and go about his business." *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 1551-52, 113 L. Ed. 2d 690 (1991). The person has been seized when the police, by means of physical force or show of authority, have in some way restrained the liberty of a citizen, and the person has actually submitted to the show of authority. *Id.* at 626-27, 111 S. Ct. at 1550-51.

## I. The Marijuana Found on Smith's Person

■ In the instant case, the People attempt to characterize the police encounter with Smith as a stop-and-frisk situation pursuant to *Terry.* Assuming *arguendo* that the *Terry* standard applies to the encounter, the officers have failed to demonstrate the reasonable suspicion that is required to engage in a *Terry* pat-down. Each of the three justifications proffered by the People to establish reasonable suspicion for a *Terry* stop is without merit. First, the mere fact that PMP is regarded as a high-crime area does not justify an investigatory frisk of anyone whom the police happen to observe in the area. *See Brown v. Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 2641, 61 L. Ed. 2d 357 (1979); *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). Second, the fact that the officers were on high alert because they found someone **else** in possession of a firearm cannot help establish reasonable suspicion for **this** defendant. At the hearing, the officers did not indicate any connection whatsoever between that individual and Smith, and they conceded that they did not observe Smith engaged in any illegal activity.

Finally, the People attempt to characterize Smith's conduct as "flight," which may provide an adequate basis for reasonable suspicion if it occurs from an area known for narcotics trafficking. *See Wardlow*, 528 U.S. at 121. The Court disagrees, however, that the facts established at the hearing support an inference that Smith fled from the officers. In fact, testimony indicated that Smith ran **toward** the officers in attempting to

235

comply with their directions. The mere fact that he was waving his arms excitedly does not constitute flight, and his jumping up excitedly and running toward Officer Allen did not permit the officers to reasonably conclude that Smith was armed. Indeed, Smith's conduct is quite reasonable under the circumstances, as he was responding to multiple police officers pointing their weapons at him.

Even if each of these proffered justifications standing alone would not justify a *Terry* stop, the government urges the Court to uphold the detention because it argues that these circumstances, when taken together, created a reasonable suspicion of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 8-10, 109 S. Ct. 1581, 1585-87, 104 L. Ed. 2d 1 (1989) (reasonable suspicion depends on "the totality of circumstances—the whole picture"; even if any one factor alone is insufficient to justify an investigatory detention, taken together they may suffice). The Court disagrees, finding the facts of this case somewhat similar to the Tenth Circuit case of *United States v. Davis*, 94 F.3d 1465 (1996).

In that case, the prosecution offered several justifications for the officers' *Terry* stop: the defendant was in a neighborhood frequented by criminals, he was approaching a premises known to have served liquor without a license, he walked away from police after making and breaking eye contact with the officers, he kept walking in the same direction after officers requested him to stop, he had his hands in his pockets, and the officers knew of the defendant's prior criminal record. *Id.* at 1468-69. The Tenth Circuit suppressed the gun that was seized from the defendant, concluding that, even considering the totality of the circumstances, the government failed to show "any specific factual basis" for suspecting that a particular crime was being committed at the time the defendant was detained. *Id.* at 1470. Similarly, in the case at bar, even considering the totality of the circumstances, the Court believes that the officers have failed to offer "a specific, articulable and objective factual basis" to believe that Smith was carrying a weapon or otherwise engaged in criminal activity. *See id.* at 1469-70.

█ It is beyond doubt that in approaching Smith with guns drawn and demanding that he get down on the ground, the officers clearly seized him, implicating the Fourth Amendment. A reasonable person in Smith's situation would clearly believe that he was not free to "ignore the police and go about his business." *Hodari*, 499 U.S. at 628. The police, by means

236

of both physical force and show of authority, restrained Smith's liberty, and Smith submitted to the officers—indeed, he had no other choice. The Court finds that the officers lacked the requisite reasonable suspicion that criminal activity was afoot to justify the intrusion, and, therefore, their seizure of Smith violated the Fourth Amendment. Furthermore, the pat-down of Smith was not justified, because, taking into account the totality of the circumstances, a "reasonably prudent" officer would not be "warranted in the belief that his safety or that of others was in danger." *See Terry,* 392 U.S. at 27. As a result, the Court holds that the marijuana found on Smith's person shall be suppressed.

## II. Admissibility of the Cocaine Found on the Back Porch

### A. Plain View

■Although it is a close question, the Court must ultimately reject the People's assertion that the "plain view" doctrine establishes admissibility of the crack cocaine discovered on the back porch of Building 11. First, the Court finds that the cocaine was not in plain view. There was no testimony that the officers observed it from the PMP courtyard or any other public area. In fact, testimony specifically established that the officers could **not** see the cocaine from their vantage point. The People's assertion that the officers were in the outdoor common areas of PMP open to the public is not entirely accurate. Officer Brown testified that she saw the baggies of cocaine only after she stepped onto the back porch of Building 11.

■ It is worth pointing out that the back porch of a house is likely within the "curtilage" of the home, which the Supreme Court has recognized as deserving of privacy protections. *See Charles,* 290 F. Supp. 2d at 614 (Fourth Amendment protections apply to "the area around the home to which the activity of home life extends") (quoting *Oliver v. United States,* 466 U.S. 170, 182 n. 12, 104 S. Ct. 1735, 1743, 80 L. Ed. 2d 214 (1984)). Therefore, the police may have needed to rely on a warrant or an exception to the warrant requirement in order to search the back porch. This is significant because the plain view doctrine only applies if the officers are legally on the premises at which they observe the contraband. *Horton v. California,* 496 U.S. 128, 136, 110 S. Ct. 2301, 2308, 110 L. Ed. 2d 112 (1990).

■■ The plain view doctrine may in some instances excuse the need for police to obtain a warrant, but it does not permit the seizure of

evidence if officers arrive at the place where the evidence can be seen in plain view only through previous conduct that violates the Fourth Amendment. 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 7.5(a), at 672 (2004) ("The first and most fundamental prerequisite to reliance upon plain view as a basis for a warrantless seizure . . . is that 'the initial intrusion which brings the police within plain view of such an article' is itself lawful.") (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S. Ct. 2022, 2037, 29 L. Ed. 2d 564 (1971)). Once again, the *Davis* case from the Tenth Circuit is instructive. In *Davis,* the district court had concluded that because the defendant himself removed a gun from his pocket and threw it onto the back seat of the police car, the weapon was in "plain view" and thus the officers' seizure of the gun did not violate the Fourth Amendment. 94 F.3d at 1470. The Tenth Circuit reversed, holding that the defendant's act of removing the firearm and placing it in plain view was a direct result of his unlawful detention, which was unsupported by reasonable suspicion. *Id.* Similarly, in the case at bar, it is significant that the police did not view the cocaine until, subsequent to Smith's detention, Officer Brown searched the back porch. Even under the government's version of the facts, the cocaine would not have been readily visible but for Smith's detention by Officer Allen. Because the detention was unlawful, and because this illegality led to the search of the area where the police could subsequently observe the evidence, the government cannot rely on the plain view doctrine to justify seizure of the cocaine.

## B. Inevitable Discovery

█ A court must suppress from the government's case in chief any evidence which is either the direct or indirect product of an illegal arrest or search. *Wong Sun v. United States,* 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Therefore, the cocaine must be suppressed as "fruit of the poisonous tree" pursuant to *Wong Sun,* unless the evidence fits within an exception to the exclusionary rule.

█ One such exception to the exclusionary rule is the "inevitable discovery" doctrine—if the police ultimately and inevitably would have discovered the evidence by lawful means notwithstanding that an illegal seizure actually led to the evidence, the evidence may be admitted at trial. *Nix v. Williams,* 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *United States v. Vasquez De Reyes,* 149 F.3d 192, 194-95 (3d Cir.

1998). It is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence. *Vasquez*, 149 F.3d at 195. The analysis must focus upon historical facts capable of ready verification, and not upon mere speculation. *Id.* (citing *Nix*, 467 U.S. at 444, n. 5; *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)).

██ Here, the People have failed to demonstrate that the evidence would inevitably have been acquired through lawful means. Testimony from the officers indicated that a search of the back porch was initiated only after Smith was seized, and there was no indication that any of the officers planned prior to Smith's arrest to search that specific area of PMP. It appears that the back porch would not have been searched **but for** the illegal arrest of Smith; if the officers wished to approach the back porch for closer inspection before apprehending Smith, they could have done so, but they did not. Similarly, there was no testimony that routine police procedures on the night in question would have led the police to the back porch of Building 11.

As the Seventh Circuit stated in *United States v. Jones*, 72 F.3d 1324 (7th Cir. 1995):

> ██ [s]peculation and assumption do not satisfy the dictates of *Nix*, however. Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof.

*Id.* at 1334 (citations omitted). In the instant case, the People have failed to meet their burden of proof regarding the inevitable discovery of the cocaine.

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion to Suppress is **GRANTED**; and it is further

**ORDERED** that a copy of this Order be directed to Courtney Reese, Assistant Attorney General, and to Julie Smith Todman, Esq., Office of the Territorial Public Defender.