**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 30, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

FRANCISCO SANTIO,

      Defendant-Appellant.

No. 08-4216
(D.Ct. No. 2:07-CR-00378-TC-1)
(Utah)

_____

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BRORBY,** and **MURPHY**, Circuit Judges.



      Appellant Francisco Santio pled guilty to one count of being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In pleading guilty,

Mr. Santio reserved his right to challenge the district court's ruling on his motion

to suppress evidence. On appeal, he contends the district court erred in denying

his motion to suppress because law enforcement officers lacked a reasonable and

articulable suspicion he engaged in a criminal activity for the purpose of stopping

him. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

_____

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

## I. Factual and Procedural Background

The following facts, provided as evidence at the suppression hearing and otherwise supported by the record, surround Mr. Santio's detention and arrest. At about 3:30 a.m. on May 16, 2007, a South Jordan City, Utah detective, Bret Miller, requested assistance from Jared Nichols, another South Jordan City detective, and Richard Simonelli, a United States deputy marshal, concerning an unoccupied stolen vehicle. Specifically, Detective Miller asked them to stake out the stolen vehicle in case anyone came for it. According to Detective Nichols, he knew the area where the stolen vehicle was parked because it involved a crime area, he had "been there on some stolen vehicles in the past," and he had been there on different gang unit calls. Detective Nichols and Deputy Simonelli, who are both members of the Salt Lake City Metro Gang Unit, drove separate unmarked police cars and parked on the same street as the stolen vehicle, "blend[ing] in with the rest of the cars on the street." Detective Nichols parked on the north side of the street, facing west, two houses east of and on the same side of the street as the stolen car; while Deputy Simonelli parked facing east, across the street from the stolen vehicle.

After twenty minutes without any foot traffic, Mr. Santio and a woman walked past Deputy Simonelli's unmarked car, heading eastbound on the south side of the street, across from the stolen vehicle. Detective Nichols explained

that as Mr. Santio walked down the street in the direction of the stolen vehicle, he "kept looking really fidgety, kept looking around, just very suspicious" and "nervous." Similarly, Deputy Simonelli described Mr. Santio as "looking back over his shoulder," "looking around," and "looking behind him, like he was looking for someone to come up behind him" or to "see if anybody was watching them." Mr. Santio continued to walk in the direction of the stolen car, and when he was directly across from it, he stopped and looked toward the area of the vehicle. Mr. Santio then sat down on the curb directly across from the vehicle for a minute or two, and, according to Detective Nichols, was then "really looking the area over," "looking everywhere," and "looking around like he was looking for someone or looking out over the area." Detective Nichols found it "very suspicious that [Mr. Santio] was sitting directly across the street from the car" and "felt he had some connection towards the car." It is not clear whether Mr. Santio noticed the officers' presence.

Mr. Santio then walked away, at which time Detective Nichols noticed he was wearing a long white belt which hung down to his knees. Based on his training and experience, which included eight years in law enforcement and two and one-half years in the metro gang unit, he believed the white belt "possibly could be a part of a gang-type of a flag, a signal they send out." Similarly, when Mr. Santio earlier walked past him, Deputy Simonelli noticed the white belt and,

-3-

based on his three years of experience with the metro gang unit, also believed it indicated gang affiliation. He also noticed Mr. Santio was wearing blue jeans and a blue shirt and knew Sureno gang members typically wear all blue. Detective Nichols also noticed Mr. Santio wore baggy pants, which he stated "could conceal anything ... as far as guns, weapons, [or] knives."

At that time, Detective Nichols attempted to stop Mr. Santio by pulling up behind him in his unmarked car and turning on his emergency lights. At first, Mr. Santio "just kept walking" without turning around, which "raised a flag" for Detective Nichols, but eventually Mr. Santio stopped. While explaining a stolen vehicle was the reason for the stop, Detective Nichols "noticed that [Mr. Santio] had a tattoo of a spiderweb right on his chin," which he believed could mean Mr. Santio served prison time. Similarly, Deputy Simonelli noticed the spiderweb tattoo, which he believed could indicate gang affiliation. Detective Nichols then asked Mr. Santio if he "kicked it with anybody" to ascertain whether he was a gang member; Mr. Santio responded his gang name was "Trouble" and "he kicked it with the Southside," which verified to Detective Nichols that Mr. Santio was a gang member with either the Southside Surenos or Southside Nortenos.

Based on his experience, Deputy Simonelli was on "alert" for his and Detective Nichols's safety. Similarly, based on Mr. Santio's physical

-4-

characteristics and behavior, Detective Nichols asked Mr. Santio if he had any weapons, to which he replied "he had a couple of pair of scissors," removed them from his pockets, and threw them on the grass. Detective Nichols then told Mr. Santio to stop reaching into his pockets and patted him down.

While patting Mr. Santio down, Detective Nichols found a gun magazine holding nine .40 caliber bullets in it. He then asked Mr. Santio if he was a convicted felon, to which he responded "yes." At that time, Detective Nichols handcuffed Mr. Santio. Meanwhile, the woman accompanying Mr. Santio told Deputy Simonelli that Mr. Santio had a gun, which, with her help, the officers found hidden by a fence just a few feet away from where Mr. Santio stopped. Later, authorities determined Mr. Santio had nothing to do with the stolen vehicle.

On June 13, 2007, an indictment issued, charging Mr. Santio with one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1). Mr. Santio filed a motion to suppress the firearm and ammunition obtained as a result of his stop and seizure. After a hearing on the motion, where Detective Nichols and Deputy Simonelli proffered the foregoing testimony, the district court issued a written decision denying Mr. Santio's motion. It determined that "[b]ased on the totality of circumstances, Detective Nichols and Deputy Simonelli had a

reasonable suspicion that Mr. Santio was involved in criminal activity [sufficient] to justify the initial stop." In making this determination, the district court found: (1) the police observed Mr. Santio and his female companion walking in a high crime neighborhood where stolen vehicles had been of concern in the past; (2) they were walking in this high crime neighborhood very late at night, at 3:30 a.m.; (3) Mr. Santio's long white belt was a possible indicium of gang involvement; (4) both officers "credibly testified" Mr. Santio was acting in a suspicious manner, leading both of them to believe he was involved with the stolen vehicle; and (5) Mr. Santio's behavior, including his walking toward and then sitting directly across from the stolen vehicle, indicated an interest in or connection with the vehicle.

With respect to the search of Mr. Santio's person, the district court found the officers "had ample reason to believe [he] might be armed and dangerous." It based its determination on Mr. Santio's: (1) gang affiliation and moniker "Trouble"; (2) baggy pants, which could conceal guns, knives, or other weapons; (3) spiderweb tattoo on his face; and, "most importantly," (4) admission he was carrying weapons when asked and voluntary removal of two pair of scissors from his pockets. The district court explained that once the officers "knew Mr. Santio was carrying weapons, they had an undeniable concern for safety to justify the minimal intrusion of the search."

Following the district court's denial of his motion to suppress, Mr. Santio entered a conditional guilty plea to Count One for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). After Mr. Santio pled guilty, a federal probation officer prepared a presentence report in conjunction with the 2007 United States Sentencing Guidelines, which resulted in a recommended advisory guideline range of thirty to thirty-seven months imprisonment. Mr. Santio's only objection concerned an error in the presentence report, which was corrected by the probation officer. The district court then sentenced Mr. Santio to thirty-four months imprisonment and thirty-six months supervised release. Mr. Santio is not appealing either his sentence or the search of his person.

## II. Discussion

In appealing his conviction, Mr. Santio argues the district court erred in denying his motion to suppress evidence because the police lacked a reasonable and articulable suspicion he was engaged in criminal activity for the purpose of stopping or detaining him. In support of his argument, Mr. Santio claims that while "[t]he district court relied on five factors to support its finding," "[n]one of these factors standing alone, provides a lawful basis for the investigative detention." Instead, he claims "all of the factors relied on by the district court are consistent with lawful behavior." In making this argument, Mr. Santio relies primarily on our decision in *United States v. Davis,* 94 F.3d 1465 (10th Cir.

-7-

1996), contending that, like that case, no specific factual basis existed for suspecting him of committing a particular crime at the time the officers detained him. In response, the government argues the district court properly denied Mr. Santio's motion to suppress based on the five factors it articulated.

In reviewing the district court's denial of Mr. Santio's motion to suppress, we examine a district court's "factual findings for clear error and view the evidence in the light most favorable to the government." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.), *cert. denied*, 129 S. Ct. 2418 (2009). However, "[w]e review de novo the reasonableness of a search or seizure under the Fourth Amendment." *Id.* Additionally, "[t]he credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *Id.*

The Supreme Court, in *Terry v. Ohio*, established a law enforcement officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002) (quoting *Terry*, 392 U.S. 1, 22 (1968)). "Under the Fourth Amendment, an investigative detention ... is reasonable if it is ... justified at its inception and ... reasonably related in scope to the circumstances which

justified the interference in the first place." *DeJear*, 552 F.3d at 1200 (quotation marks and citation omitted). "A detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Id.* (quotation marks and citation omitted). Reasonable suspicion may exist where an officer has "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks and citation omitted). However, "[i]nchoate suspicions and unparticularized hunches are not sufficient." *DeJear*, 552 F.3d at 1200 (quotation marks and citation omitted). "Nevertheless, the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause." *Id.* (quotation marks and citations omitted).

We determine whether reasonable suspicion exists from the totality of the circumstances. *See Arvizu*, 534 U.S. at 273. A "determination that reasonable suspicions exists ... need not rule out the possibility of innocent conduct." *Id.* at 277. Thus, behavior susceptible to innocent interpretation may create reasonable suspicion depending on the totality of the circumstances confronting an officer. *See Oliver v. Woods*, 209 F.3d 1179, 1187-88 (10th Cir. 2000). When determining if a detention is supported by reasonable suspicion, we "defer to the ability of a trained law enforcement officer to distinguish between innocent and

suspicious actions." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (quotation marks and citations omitted).

In this case, the district court articulated five factors it considered in determining that "[b]ased on the totality of the circumstances, Detective Nichols and Deputy Simonelli had a reasonable suspicion that Mr. Santio was involved in criminal activity [sufficient] to justify the initial stop."  First, it noted the police observed Mr. Santio and his female companion walking in a high crime neighborhood where stolen vehicles, like the one at issue, had been of concern in the past.  Presence in a high crime area is "among the relevant contextual considerations in a *Terry* analysis," even though such presence "standing alone is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also DeJear*, 552 F.3d at 1201.

Not only were Mr. Santio and his companion walking in a high crime neighborhood, but the district court found they did so very late at night – at 3:30 in the morning.  The time of the detention, including the late hour of the night or early hour of the morning, is a factor we consider in determining whether reasonable suspicion exists.  *See United States v. Clarkson*, 551 F.3d 1196, 1202 (10th Cir. 2009); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th

-10-

Cir. 1997).

In addition, the district court found Mr. Santio wore a long white belt, which the officers believed, based on their experience in the metro gang unit, was a possible indicium of gang involvement. Mr. Santio also sported blue clothing, which one of the officers believed also indicated gang affiliation. Although gang affiliation or prior criminal conduct cannot, standing alone, create a reasonable suspicion to support a search or seizure, under certain circumstances it may be an appropriate factor in determining if reasonable suspicion exists for a detention or search. *See DeJear*, 552 F.3d at 1201 (indicating the fact officer had previously seen people standing outside home wearing colors affiliated with local gangs was an appropriate factor, when considered as part of the totality of the circumstances, to support reasonable suspicion for detention); *United States v. Garcia*, 459 F.3d 1059, 1067 (10th Cir. 2006) (holding that "[a]lthough not necessarily determinative by itself, ... gang connection further supports the reasonableness of a weapons frisk"); *see also United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) (holding that "[k]nowledge of gang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a *Terry* stop").

Next, the district court found both officers credibly testified Mr. Santio was acting in a suspicious manner, leading both of them to believe he was involved with the stolen vehicle. The conduct leading to this belief included the fact that as Mr. Santio walked down the street in the direction of the stolen vehicle, he "kept looking really fidgety, kept looking around, just very suspicious," and was "looking back over his shoulder," "looking around," and "looking behind him, like he was looking for someone to come up behind him" or to "see if anybody was watching them." This suspicious behavior intensified as Mr. Santio sat across from the stolen vehicle, when he was "really looking the area over" and "looking everywhere."

We have held "nervousness is a sufficiently common-indeed natural-reaction to confrontation with the police" and has "limited significance in determining whether reasonable suspicion exists" unless the nervousness "is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion." *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005) (quotation marks and citations omitted). In this case, no police interaction precipitated Mr. Santio's nervous behavior, so no natural reaction to a confrontation with the metro gang unit officers is at issue. Even if Mr. Santio knew of their presence, his nervous behavior involved an inordinately persistent and unusually prolonged amount of looking around the area while walking in the

-12-

direction of the stolen vehicle, approaching it, and then sitting across the street from it. Not only did he display this type of nervous behavior, but, as discussed by the district court, his nervousness was accompanied by other probative grounds for reasonable suspicion. Thus, in this instance, Mr. Santio's nervousness clearly constituted a pertinent factor for consideration by an experienced law enforcement officer staking out the stolen vehicle.

Mr. Santio contends his nervous behavior can be explained by the fact he was with a woman in a high crime area late at night, and "may have been looking around the area for rival gang members." However, as previously discussed, behavior susceptible to innocent interpretation may create reasonable suspicion depending on the totality of the circumstances confronting the officer, *see Oliver*, 209 F.3d at 1188, and we defer to the ability of trained officers to distinguish between innocent and suspicious actions*, see Zubia-Melendez*, 263 F.3d at 1162. Thus, while simply "looking around" may not alone garner much weight, it may be considered under a totality of circumstances analysis, as it was here.

Finally, the district court considered the fact Mr. Santio walked toward, and then sat directly across from, the stolen vehicle for two minutes, which it determined indicated an interest in or connection with the vehicle. Again, behavior susceptible to innocent interpretation may create reasonable suspicion

depending on the totality of the circumstances. *See Oliver*, 209 F.3d at 1188. In this case, the officers were on a stake out to watch for anyone who may have had an interest in a stolen vehicle for the purpose of finding out who stole it. The fact Mr. Santio walked toward, sat across from, and looked toward the stolen vehicle before moving on, was sufficient for the district court to find an indication of his interest in or connection with the stolen vehicle, especially when coupled with his behavior in continuously looking around in a suspicious or evasive manner. Thus, based on the totality of the circumstances and in viewing the evidence in the light most favorable to the government, we conclude the district court did not err in finding a reasonable suspicion existed that Mr. Santio was involved in criminal activity sufficient to justify the initial stop.

In arguing the circumstances involved in this case do not support a reasonable suspicion for his stop, Mr. Santio relies heavily on our decision in *United States v. Davis.* While we recognize some similarities in the circumstances presented here with those in that case, our decision in *Davis* does not change our conclusion the district court did not err in denying Mr. Santio's motion to suppress.

In *Davis*, officers on patrol arrived in an area where gunshots reportedly had been fired. *See* 94 F.3d at 1467. One of those officers had previously

investigated two shootings in the area, had been involved in eight arrests involving drugs and/or firearms in the same area, and knew of active gang presence there. *Id.* In addition, the officers were aware that one building in the area housed a business known as a "juice joint" because it illegally sold liquor without a license while also operating legal activities involving dominoes and pool play. *Id.* While investigating the report of gunshots in the area, the officers observed four occupants in a vehicle parked just north of the juice joint and saw the defendant exit the vehicle. *Id.* As he exited the vehicle, he made eye contact with one of the officers, broke that eye contact, and began walking toward the juice joint with his hands in his pockets. *Id.* The officer recognized him, knew he was an ex-convict acquitted of a gang-related homicide, and had information he had been selling narcotics. *Id*. At that time, the officers told the defendant to stop and take his hands out of his pockets, but he continued walking in the same direction and manner until he was physically forced to stop. *Id.* Ultimately, officers found a firearm in the back seat of his vehicle. *Id.*

In *Davis*, we determined the district court erred in denying the defendant's motion to suppress evidence of the firearm because the officers did not have a reasonable, articulable suspicion of criminal activity. *Id.* at 1468. In making that determination, we found neither the defendant's presence in a high crime area nor his approaching a business offering both illegal and legitimate activities was

-15-

enough, standing alone, to conclude he engaged in criminal conduct. *Id.* We also concluded his conduct in breaking eye contact and walking away from the officers did not provide "a particularized and objective basis" for stopping him. *Id.* Finally, we found that neither having his hands in his pockets on a December night nor knowledge of his prior criminal record, standing alone, justified an investigative stop. After considering each of these factors separately, we considered the totality of the circumstances presented and determined the government failed to show any specific factual basis for suspecting the defendant committed the crime of unlawfully carrying a firearm, including, for example, a lack of evidence he had a suspicious bulge in his coat pockets, they received a tip from an informer, or the defendant made any threatening movement toward the officers. *Id.* at 1469-70.

Like *Davis*, certain circumstances involved here, standing alone, are insufficient to suggest a reasonable and articulable suspicion of criminal activity. As previously discussed, these circumstances include Mr. Santio's presence in a high crime area, the time of night, and his gang affiliation. As we also pointed out, some nervous behavior when in the presence of a police officer generally is not enough to indicate involvement in criminal activity. However, simply because these circumstances, standing alone, are not sufficient to implicate criminal activity does not mean they may not be considered under the totality of

-16-

the circumstances, as the district court did here and we did in *Davis*.

In addition, unlike the defendant in *Davis*, Mr. Santio's behavior implicated a reasonable and articulable suspicion he was involved in the very criminal activity the officers were investigating; i.e., the stolen vehicle and Mr. Santio's seemingly discernable interest in that vehicle. Mr. Santio's behavior included not only his walking toward the stolen vehicle, but his stopping and sitting across from it, looking toward the area where it was parked, and his display of extreme and prolonged signs of nervousness, regardless of whether he could see the officers in the dark, seated in their unmarked vehicles. This conduct is different from *Davis,* where the defendant: (1) merely approached a building housing, in part, a legitimate pool and dominoes business which was not specifically the subject of the gunshots being investigated; (2) only showed negligible nervous behavior by breaking eye contact and walking away from the *visible presence* of police officers, and (3) otherwise displayed no sign he was carrying a gun or involved in the gunshots at issue. Thus, when considering the totality of the circumstances here, including Mr. Santio's extreme, prolonged nervous behavior, his seemingly conspicuous interest in the stolen vehicle, the lateness of night, his presence in a high crime area, and his apparent gang affiliation, we conclude, unlike we did in *Davis*, that a specific and articulable factual basis existed for suspecting he committed the crime in question.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's denial of Mr. Santio's motion to suppress evidence and his conviction.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge