HOLMES, Circuit Judge,
dissenting.
The majority concludes that the district court was correct in granting Mr. Dell’s suppression motion. The majority reasons that Officer Tafisi “lacked the requisite reasonable suspicion” to stop Mr. Dell because Officer Tafisi acted on nothing more than “a hunch based upon a momentary observation.” Maj. Op. at 441-42, 447. I respectfully disagree. Because I believe that Officer Tafisi’s suspicion that Mr. Dell was engaged in criminal conduct was reasonable and based on facts — not a hunch— I would reverse the district court’s suppression order and remand the case for further proceedings.
I
At around 5:00 p.m. in late August of 2010, Moe Tafisi, an officer of the Salt Lake City Police Department was patrolling the Glendale area of Salt Lake City, Utah, in his marked patrol vehicle. Officer Tafisi had spent his entire six-and-one-half-years with the Salt Lake City Police Department patrolling that area. In his experience, Officer Tafisi believed Glendale to be an area for “high[] crime.” Aplt.App. at 66 (Mot. to Suppress Hr’g Tr., dated Dec. 13, 2010) (Tafisi Test.). More specifically, it was a high-crime area for “a lot” of car break-ins (i.e., “car prowl[s]”) and “drugs and so forth”— *448 which he had personally been involved in investigating. Id. at 66,100-01.
Officer Tafisi was driving south on Navajo Street when approximately fifteen yards away he saw Mr. Dell and a female companion[1] standing next to a parked, empty car located on the west side of the street. Mr. Dell was standing on the driver’s side, and his companion was on the passenger’s side of the ear. Both were leaning toward the car, a few inches away from each window, and peering into the car in a back-and-forth manner. From Officer Tafisi’s perspective, it did not appear as if the two were entering or exiting the vehicle; instead, it appeared as if “they were just standing there looking.” Id. at 69. Although Officer Tafisi admitted that Mr. Dell and his companion could have “happened to pass the vehicle,” he testified that it “did not appear that way,” id. at 99, and their behavior was “[not] consistent” with someone just walking by, id. at 102.
Officer Tafisi considered these actions by Mr. Dell and his companion to be “indicative [of] what [ ] car prowl[ers] would do.” Id. at 87. Yet, what happened next further troubled him. As Officer Tafisi drove toward the pair, Mr. Dell looked towards Officer Tafisi’s direction. After seeing Officer Tafisi, Mr. Dell immediately turned south and walked away from Officer Tafisi’s patrol car — in the same direction that Officer Tafisi was driving. The companion, on the other hand, did not move in lockstep with Mr. Dell. Instead she “paused a little bit” — for a few seconds — before she decided to follow Mr. Dell. Id. at 69.
Officer Tafisi did not yet attempt to make contact with Mr. Dell and his companion. Instead, he decided to pass the pair to see whether the car belonged to them or if they were going to go back to the car. As Officer Tafisi passed by, he could see Mr. Dell and the companion in his rearview mirror. While Mr. Dell continued to walk south, his companion again did not act in concert with him; instead, she “backtracked]” toward the car, then a “few seconds” later turned back around to follow Mr. Dell. Id. at 70. Having found all of these actions “suspicio[us]” and also “indicative” of car prowling, Office Tafisi finally decided to make contact. Id. at 70, 87.
Officer Tafisi made a u-turn and parked in the middle of the street. He then motioned to Mr. Dell with his hand, and said, “Hey, come over.” Id. at 85 (internal quotation marks omitted). Standing on the sidewalk, Mr. Dell complied and approached Officer Tafisi’s patrol car in the street.[2] During the ensuing encounter, Officer Tafisi became increasingly suspicious of Mr. Dell. Officer Tafisi consensually searched Mr. Dell and found a gun in his front pocket.
Mr. Dell was charged in a one-count indictment with felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He subsequently filed a motion to suppress the evidence found and statements that he made during the encounter as fruit of an unlawful stop. The government opposed the motion, arguing that the encounter was both consensual and supported by reasonable suspicion.
*449 After an evidentiary hearing, the district court granted Mr. Dell’s motion, finding that the encounter amounted to a seizure that was not supported by reasonable suspicion. The district court first concluded that Officer Tafisi’s initial encounter with Mr. Dell “was an investigatory stop because a reasonable person, under the totality of the circumstances, would not have felt at liberty to ignore Officer Tafisi.” Aplt. App at 54 (Dist. Ct. Order & Mem. Decision, filed Mar. 16, 2011). Because the district court held that the initial encounter was an investigative stop, it next analyzed everything leading up to the encounter to determine whether Officer Tafi-si had reasonable suspicion to make that stop. Based upon an analysis of the totality of the circumstances, as required by Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the district court held that Officer Tafisi did not have “a reasonable, articulable suspicion that Mr. Dell was engaged in criminal activity.” Aplt.App. at 55. The district court concluded that three key facts present in this case, considered together, were insufficient to create reasonable suspicion: (1) Officer Tafisi believing he was in a high-crime area; (2) Officer Tafisi observing Mr. Dell and his companion standing on either side of a car peering inside; and (3) Mr. Dell and his companion walking away upon seeing Officer Tafisi. Consequently, the court granted Mr. Dell’s motion to suppress. Thereafter, the government filed a timely notice of appeal.
II
In reviewing the district court’s decision to grant Mr. Dell’s motion to suppress, our precedent dictates that we view the facts in the light most favorable to the prevailing party — Mr. Dell. See, e.g., United States v. Salazar, 609 F.3d 1059, 1061 (10th Cir.2010); United States v. Jones, 523 F.3d 1235, 1237 (10th Cir.2008). And we “acceptf ] the factual findings of the district court unless they are clearly erroneous.” United States v. Karam, 496 F.3d 1157, 1161 (10th Cir.2007). However, “the ultimate determination of reasonable suspicion ... is a mixed question of law and fact that we review de novo.” United States v. Hauk, 412 F.3d 1179, 1185 (10th Cir.2005); see United States v. Chavira, 467 F.3d 1286, 1290 (10th Cir.2006) (“[W]e review de novo the ultimate determination of reasonableness under the Fourth Amendment because that is a legal conclusion.”).
The majority is correct that this case turns on one straightforward issue: Did the facts known to Officer Tafisi before he called Mr. Dell over give rise to a reasonable suspicion that criminal activity — specifically, car prowling — was afoot? The parties, of course, stake out opposing positions on this issue. The government argues that Officer Tafisi’s brief investigatory detention of Mr. Dell was supported by reasonable suspicion because the “actions of [Mr.] Dell and his companion around the unoccupied, parked car and their reaction upon noticing Officer Tafisi were highly suspicious.” Aplt. Opening Br. at 5. Mr. Dell conversely argues that the “actions taken by [Mr.] Dell and his companion prior to the investigatory stop were [] innocuous.” Aplee. Br. at 14. Considering the parties’ arguments, the majority concludes that what happened here was not legally sufficient to engender a reasonable suspicion of criminal conduct, and Mr. Dell’s (and his companion’s) actions were like that of anyone else on the street. See, e.g., Maj. Op. at 446 (“But what Officer Tafisi actually saw was too tame to suggest reasonable suspicion.”). However, as I explain below, this conclusion is fatally flawed because even “a series of acts, each of them perhaps innocent if viewed separately, ... [can] warrant! ] further investí- *450 gation” if taken together. United States v. Sokolow, 490 U.S. 1, 9-10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting Terry, 392 U.S. at 22, 88 S.Ct. 1868) (internal quotation marks omitted).
A
The Fourth Amendment protects the public from “unreasonable searches and seizures,” U.S. Const, amend. IV, including unreasonable “investigatory stop[s]” or detentions, United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir.2010). Because what happened here was clearly an investigative detention rather than a custodial arrest, the principles originally set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), guide our determination as to the reasonableness of that detention. In Terry, the Supreme Court held that not every restriction on personal privacy or liberty that amounts to a Fourth Amendment “search” or “seizure” must be justified by the degree of particularized suspicion reflected in the probable-cause standard. See id. at 22, 30, 88 S.Ct. 1868. Rather, “the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity ‘may be afoot,’ even if the officer lacks probable cause.” Sokolow, 490 U.S. at 7, 109 S.Ct. 1581 (quoting Terry, 392 U.S. at 30, 88 S.Ct. 1868). Under the Fourth Amendment, the determination of whether an investigative detention is constitutional entails a two-step analysis: the detention “is reasonable if it is (1) ‘justified at its inception’ and (2) ‘reasonably related in scope to the circumstances which justified the interference in the first place.’ ” United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir.2009) (quoting United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir.2004)).
An investigative detention is justified at its inception if an officer has “objectively reasonable articulable suspicion that a detainee committed or is about to commit a crime.” Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir.2010) (quoting United States v. Cervine, 347 F.3d 865, 869 (10th Cir.2003)) (internal quotation marks omitted). In determining whether reasonable suspicion exists, we “view[ ] the totality of the circumstances to see whether the detaining officer had a ‘particularized and objective basis’ for suspecting legal wrongdoing,” Cortez v. McCauley, 478 F.3d 1108, 1123 (10th Cir.2007) (en banc) (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)), “rather than assessing each factor or piece of evidence in isolation,” United States v. McGehee, 672 F.3d 860, 867 (10th Cir.2012); see United States v. Guerrero, 472 F.3d 784, 787 (10th Cir.2007) (“The Supreme Court has instructed that we not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct.”). Thus, “[n]o one factor is determinative.” McGehee, 672 F.3d at 867 (alteration in original) (quoting United States v. Holt, 264 F.3d 1215, 1220 (10th Cir.2001) (en banc)) (internal quotation marks omitted).
When making our assessment of whether reasonable suspicion exists, “deference is to be accorded a law enforcement officer’s ability to distinguish between innocent and suspicious actions,” id. (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir.1997)) (internal quotation marks omitted), and we “need not rule out the possibility of innocent conduct,” id. (quoting United States v. Albert, 579 F.3d 1188, 1197 (10th Cir.2009)) (internal quotation marks omitted). “[W]e consider the reasonableness of an officer’s actions using an ‘objective standard.’ ” Id. (alteration in *451 original) (quoting United States v. Winder, 557 F.3d 1129, 1134 (10th Cir.2009)) (internal quotation marks omitted). “Under this objective standard, we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate.” Id. (quoting Winder, 557 F.3d at 1134) (internal quotation marks omitted).
We may assume without deciding that Mr. Dell was detained or “seized” for Fourth Amendment purposes when Officer Tafisi told him, “Hey, come over,” and he obeyed this command. See, e.g., Salazar, 609 F.3d at 1064 (“When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen submit[s] to the assertion of authority.’ ” (alteration in original) (quoting California v. Hodari D., 499 U.S. 621, 625-26, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991))). In other words, Officer Tafi-si’s command, and Mr. Dell’s subsequent acquiescence, gave rise to an investigative detention. Since that investigative detention would be justified only if it was lawful at its inception, we examine whether at that moment Officer Tafisi had an “objectively reasonable articulable suspicion that [Mr. Dell had] committed or [was] about to commit a crime.” Lundstrom, 616 F.3d at 1120 (quoting Cervine, 347 F.3d at 869) (internal quotation marks omitted).[3]
B
Because Officer Tafisi was the only person who testified at the hearing on Mr. Dell’s motion to suppress, his testimony represents the entire universe of facts that we have available in considering whether he ultimately had reasonable suspicion to conduct an investigative stop of Mr. Dell. The majority — tracking the district court’s analysis — identifies three observations made by Officer Tafisi, which it concludes “at least arguably play into the reasonable suspicion analysis”:
(1) Mr. Dell and his companion were in what the officer thought to be a high-crime neighborhood, particularly with regard to car break-ins and drug crimes; (2) Mr. Dell and his companion were peering into the windows of a legally parked car; and (3) Mr. Dell and his companion walked away from the parked car upon seeing that the patrolling officer was headed in their direction.
Maj. Op. at 444; see Aplt.App. at 56. The majority’s summary of the evidence, however, does not provide a comprehensive picture of the facts that Officer Tafisi faced that day. We must consider all of those facts in our analysis:
• First, Officer Tafisi was patrolling a neighborhood that he knew well (over six-and-one-half years), and he knew it to be a high-crime area. More importantly, it was a high-crime area specifically for “car prowl[s],” and he had personally been involved in investigating such crimes. Aplt.App. at 66,100-101.
• Second, Officer Tafisi saw Mr. Dell leaning toward a car, a few inches away from the driver’s-side window, and looking into the car in a back-and-forth manner. Mr. Dell’s companion was doing the same, but opposite him on the passenger’s side of the car.
*452 • Third, Mr. Dell and his companion were not entering or exiting the vehicle or just walking by. They appeared as if “they were just standing there looking.” Id. at 69.
• Fourth, after seeing Officer Tafisi, Mr. Dell then immediately turned south and walked away from Officer Tafisf s patrol car — in the same direction that Officer Tafisi was driving.
• Fifth, the companion did not immediately follow Mr. Dell. Instead she “paused a little bit” — for a few seconds — before she decided to follow him. Id.
• Sixth, as Officer Tafisi passed by, Mr. Dell continued to walk south, but his companion “backtrack[ed]” toward the car, then a “few seconds” later turned back around to follow Mr. Dell. Id. at 70.
• Seventh, all of foregoing actions made by Mr. Dell and his companion were consistent, based upon Officer Tafisi’s law enforcement judgment and experience, with car prowling.
With this understanding of the entire universe of facts, I believe Officer Tafisi had reasonable suspicion to stop Mr. Dell for investigative purposes.
C
The Supreme Court has explicitly rejected a “divide-and-conquer” approach to the reasonable-suspicion analysis, Arvizu, 534 U.S. at 274, 122 S.Ct. 744; instead it has told us to determine if the relevant facts “fit together into a cohesive, convincing picture of [possibly] illegal conduct,” Guerrero, 472 F.3d at 787. Yet, the majority’s analysis smacks of exactly such an impermissible divide-and-conquer approach. That is, the majority methodically (albeit unwisely) discounts in isolation the significance of the facts available to Officer Tafisi that day. Not only is the majority’s analytical framework flawed, but so are its conclusions under that framework.
1
In the majority’s opinion, it states:
The Glendale neighborhood’s supposed high-crime status was given little weight by the district court. Officer Tafisi’s assertions about crime levels in Glendale were generalized and ambiguous, and he did not specify any portion of the Glendale area which had elevated crime rates. He said that Glendale had high crime rates for car break-ins, drugs, and other unspecified types of crime. And, as the district court pointed out, no statistics or testimony backed up this claim other than Officer Tafisi’s comment that he had six and a half years’ experience patrolling the Glendale area.
In accordance with the proper standard of review, we must view the facts in the light most favorable to the defendant, and also refrain from denigrating the trial judge’s factual findings, which were made after the trial judge personally witnessed Officer Tafisi’s testimony at the suppression hearing. The district court found that Officer Tafisi’s beliefs about the area’s crime rate were anecdotal in nature, and not particularly probative or persuasive. Deferring to that finding, we decline to attribute significant weight to the fact that this incident took place in a supposed “high crime” area.
Maj. Op. at 444-45 (footnote omitted) (citations omitted).
I respectfully submit, however, that the majority’s reasoning is predicated upon a misunderstanding of the operative standard of review and our appellate role. In its headlong rush to “refrain from denigrating the trial judge’s factual findings,” Maj. Op. at 444; see also id. at 444-A5 n. 3 (“Our standard of review ... requires us *453 to defer to the facts as found by the district court.”), the majority stumbles. Specifically, although we must construe the facts in the light most favorable to Mr. Dell and accept the district court’s findings of fact unless they are clearly erroneous, we need not defer to the district court’s conclusions regarding the legal significance of the facts. Compare Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (“A policy of sweeping deference [to trial courts] would permit, [i]n the absence of any significant difference in the facts, the Fourth Amendment’s incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause. Such varied results would be inconsistent with the idea of a unitary system of law. This, if a matter-of-course, would be unacceptable.” (second, third, and fourth alteration in original) (citation omitted) (quoting Brinegar v. United States, 338 U.S. 160, 171, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)) (internal quotation marks omitted)), with United States v. Villegas, 554 F.3d 894, 898 (10th Cir.2009) (“The appearance of the hand gesture is a matter of historical fact, not involving an analysis of Fourth Amendment law, and is peculiarly a matter best left to the fact finder.”). I do not find the majority’s specific brand of deference to be part and parcel of the operative standard of review and dictated by our appellate charge.
Even accepting for the sake of argument that the district court perceived Officer Tafisi’s testimony as the majority asserts,[4] under the circumstances present here, whether Officer Tafisi’s beliefs are “probative,” or “particularly persuasive” are not factual questions — the resolution of which by the district court would rightly be entitled to deference. Instead, the answers to those questions involve conclusions about the legal significance of the facts. Cf. Cortez, 478 F.3d at 1136 (en banc) (Hartz, J., concurring in part and dissenting in part) (“Our only deference to the trial judge is in the findings of historical fact, not the determination whether the found facts establish probable cause or reasonable suspicion.”). Indeed, determining whether facts are “probative” or “particularly persuasive” ordinarily will involve the application of law to historical facts. Cf. Fed.R.Evid. 401 advisory committee’s note (“Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case.” (emphasis added)). The district court was no better situated here than we are to form such conclusions about the legal significance of the historical facts that Officer Tafisi conveyed in his testimony; consequently, the district court’s conclusions are not entitled to deference. Moreover, even if the district court’s characterization of Officer Tafisi’s testimony as “anecdotal” amounts to a factual finding, as discussed below, under the governing law, that finding does not avail Mr. Dell.
Significantly, the district court never suggested that Officer Tafisi was not a credible witness. Of course, such a factual determination by the district judge — present in the courtroom with Officer Tafisi— would have been entitled to our deference. See, e.g., United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir.1997) (noting that “[j]udging the credibility of the wit *454 nesses” is, inter alia, “within the province of the district court”). But we do not have that situation here. Officer Tafisi’s testimony stands unimpeached on credibility grounds. And, for the reasons explicated below, I think that his testimony was quite sufficient on the question of whether Mr. Dell’s investigative detention took place in a high-crime area.
To begin, I suspect that we can all agree that an individual’s presence in a high-crime neighborhood is not in itself sufficient to justify an investigative stop. See Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (“The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.”); United States v. Dennison, 410 F.3d 1203, 1208 (10th Cir.2005) (stating that a defendant’s “presence in a high-crime area is not, ‘standing alone,’ enough to provide reasonable suspicion, but it may be a ‘relevant contextual consideration’ in a Terry analysis” (quoting Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000))); cf. United States v. Davis, 94 F.3d 1465, 1468 (10th Cir.1996) (concluding that there was no reasonable suspicion where an ex-convict with a gang affiliation refused to stop when asked by an officer to do so in a high-crime area). However, “courts have repeatedly held that such a characteristic of the location of the stop [i.e., its high-crime nature] is relevant to the analysis and may be taken into consideration.” United States v. McHugh, 639 F.3d 1250, 1257 (10th Cir.2011); see, e.g., Wardlow, 528 U.S. at 124, 120 S.Ct. 673 (“[Officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.”)
Officer Tafisi testified that he had been assigned to the “Glendale area,” which has “high[ ] crime for car prowl[s] [and] high[ ] crime for drugs and so forth.” Aplt.App. at 66. The majority defers to the district court’s “finding” that this testimony was “anecdotal in nature, and not particularly probative or persuasive,” Maj. Op. at 445, and notes — as the district court did — that “no statistics or testimony backed up this claim other than Officer Tafisi’s comment that he had six and a half years’ experience patrolling the Glendale area,” id. at 444. Putting aside the analytical flaws (as discussed above) in the majority’s deference-driven approach, I am not aware of any instance where our court has been so restrictive in evaluating an officer’s credible and unchallenged testimony regarding the level of crime in a neighborhood. Not only did Officer Tafisi testify that Glendale was a high-crime area, but he went further: he indicated that it was a high-crime area for exactly the type of crime that Officer Tafisi suspected Mr. Dell of attempting to commit — a car break-in (i.e., car prowling). See United States v. Santio, 351 Fed.Appx. 324, 331 (10th Cir.2009) (“[The defendant’s] behavior implicated a reasonable and articulable suspicion he was involved in the very criminal activity the officers were investigating; i.e., the stolen vehicle and [the defendant’s] seemingly discernable interest in that vehicle.”).
I suppose one could say that Officer Tafisi’s testimony is “anecdotal” in the sense it was based on his personal observations. But that does not mean it was unreliable. Indeed, I would emphatically assert that Officer Tafisi’s observations of the neighborhood he has patrolled for six- and-one-half years are inherently reliable and exactly the type of evidence we would want to determine the characteristics of a neighborhood. Moreover, a lack of statistics to corroborate his testimony is immaterial. I know of no court (including our *455 own) that has required the government to produce crime statistics in order to buttress an officer’s observations, at least when those observations (as here) are credible and otherwise have indicia of reliability. See, e.g., United States v. Baskin, 401 F.3d 788, 793 (7th Cir.2005) (rejecting petitioner’s argument that “the government must produce ‘specific data’ establishing that a location is a ‘high-crime area’” to support reasonable suspicion).
The majority implies that because Officer Tafisi only testified that Glendale is a high-crime area — rather than testifying that the specific street in Glendale where Mr. Dell was found had elevated crime rates — we should not give his testimony significant weight when viewing the evidence in a light most favorable to Mr. Dell. See Maj. Op. at 444 (“Officer Tafisi’s assertions about crime levels in Glendale were generalized and ambiguous, and he did not specify any portion of the Glendale area which had elevated crime rates.”). However, the majority offers no Tenth Circuit authority that would support such a heightened, particularized showing. And I am not aware of any. In setting forth the relevant, salient facts in suppression cases, we have frequently referred to the high-crime nature of neighborhoods. See, e.g., United States v. Neff, 300 F.3d 1217, 1219 (10th Cir.2002) (“The neighborhood was known as a high crime area where many children live and play.”); United States v. Soto-Cervantes, 138 F.3d 1319, 1324 (10th Cir.1998) (noting that “[a] neighborhood’s reputation for housing illegal immigrants ... is a relevant factor to be considered” in the reasonable-suspicion analysis (citation omitted)); United States v. Harris, 995 F.2d 1004, 1005 (10th Cir.1993) (noting that “defendant parked his car in front of a fire hydrant in a high-crime residential neighborhood in Denver, Colorado.”). In the absence of supportive case law in our circuit, and given that our cases at least arguably indicate a contrary view regarding whether the description of a high-crime area has to be more specific than the identification of a neighborhood, I respectfully submit that the majority’s reasoning that suggests the need for heightened specificity is flawed. I conclude that Officer Tafisi’s credible and unchallenged testimony was sufficiently specific as to the location to indicate that the area of Mr. Dell’s investigative detention was a high-crime area.
2
The majority also takes issue with the significance of Officer Tafisi’s initial observation — viz., the sight of Mr. Dell and his companion on either side of the car, leaning within inches of it, while peering back- and-forth inside. “[Troubling” to the majority “is the absence of any illegal conduct by Mr. Dell (or his companion)” and, in its estimation, the fact that “[t]he conduct observed by Officer Tafisi was so innocuous and so very much in the realm of ordinary behavior that it would not lead a reasonable officer to suspect that a car break-in had occurred or was about to occur.” Maj. Op. at 446. I disagree.
Let us take a closer look at the facts. We know that Officer Tafisi was patrolling in an area prone to car break-ins, and he observed two people on either side of a car peering inside. This is conduct that, based upon his law enforcement experience and judgment, Officer Tafisi believed to be consistent with car prowling. We may properly credit that experience and judgment. See Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (suggesting that an officer may “draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person” (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, *456 66 L.Ed.2d 621 (1981)) (internal quotation marks omitted)). And, on these facts, it clearly is reasonable to do so.
To be sure, there are innocent reasons why two people might be on either side of a car peering inside it. The most obvious — and I would argue most likely— would be that the individuals were entering or exiting the car and for some reason needed to look inside. However, according to Officer Tafisi, Mr. Dell and his companion were not entering or exiting the vehicle — they appeared as if “they were just standing there looking.” And there is nothing in the record to suggest that Officer Tafisi’s testimony should be discounted or discredited.
Once the possibility that Mr. Dell and his companion were getting in or out of the car is reduced significantly, their actions at that moment become much more suspicious. In other words, if they are not coming or going from the car itself, it is much less likely that two people would stand on either side of a vehicle, peering in, for any innocent, non-criminal purpose. See 4 Wayne R. LaFave, Search & Seizure § 9.5(d), at 496 (4th ed. 2004) (“[T]he act of repeatedly looking into parked cars suggests that the person is about either for the purpose of stealing from a vehicle or for the purpose of taking a ear having the ignition keys in it, and thus it will take little else to justify a stop.”); cf. United States v. Douglas, 964 F.2d 738, 740 (8th Cir.1992) (“[The] [o]fficer ... observed appellant exiting the back seat of a vehicle; appellant did not enter one of the apartment buildings; [the officer’s] experience patrolling the apartment complex led him to believe that appellant’s activities were not consistent with that of a resident or visitor; [the officer] knew that auto break-ins had occurred in [that] area; and appellant provided an untenable explanation for his contact with the vehicle.”). More specifically, once the possibility was reduced significantly that Mr. Dell and his companion were getting in or out of the car, under the totality of the circumstances, a reasonable officer could have well concluded that there was a very real possibility that they were engaged in car prowling. In sum, given the suspicious nature of what Mr. Dell and his companion were doing and the reality that we need not conclusively rule out all innocent possibilities, see McGehee, 672 F.3d at 867, unlike the majority, I would not be inclined to describe what Officer Tafisi observed the pair doing as innocuous and, instead, believe that it (viewed along with all the factual circumstances) established the foundation for reasonable suspicion.
3
Finally, the majority also downplays the significance of what happened after Mr. Dell became aware of Officer Tafisi’s presence. It states that “Mr. Dell’s walking away upon seeing a police officer tells us very little about the likelihood of criminal activity taking place.” Maj. Op. at 445. As I explain, Mr. Dell’s reaction in walking away — coupled with his companion’s repeated bouts of hesitancy about what to do next, i.e., furtive behavior — was the stuff of reasonable suspicion.
It is uncontested that when Mr. Dell saw Officer Tafisi he immediately disengaged from looking into the car and began walking away. I freely acknowledge that this conduct does not amount to the “unprovoked [or headlong] flight upon noticing the police” that the Supreme Court concluded in Wardlow was the “the consummate act of evasion” that provided the basis for reasonable suspicion that the defendant was “involved in criminal activity” — when coupled with the fact that the flight occurred in a “high crime area.” 528 U.S. at 124-25, 120 S.Ct. 673; see Davis, *457 94 F.3d at 1468 (“[The defendant’s] actions in exiting the car, making and then breaking eye contact with the officers, and then walking away from the officers also do not furnish the basis for a valid Terry stop.”); see also Moreno v. Baca, 431 F.3d 633, 643 (9th Cir.2005) (“[The] simple act of walking away from the officers could not have been reasonably mistaken for the type of ‘flight’ the officers confronted in Wardlow.”); cf. Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality) (“The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.”).
However, we must evaluate Mr. Dell’s act of walking away in conjunction with the reaction of his companion because flight is not the only type of “nervous, evasive behavior” that exists. Furtive movements made in response to a police presence may also properly contribute to an officer’s suspicions. See, e.g., McGehee, 672 F.3d at 870 (holding that furtive actions may contribute to probable cause); DeJear, 552 F.3d at 1201 (“Furtive movements, nervousness, and the fact that conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists.”); Johnson, 364 F.3d at 1192 (“[Nervousness, even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded.” (emphasis added)); United States v. Edmonds, 240 F.3d 55, 61 (D.C.Cir.2001) (holding that a suspect’s act of reaching under the driver’s seat in response to a police presence can be factored into a reasonable-suspicion analysis as a “furtive” gesture); see also United States v. Brown, 334 F.3d 1161, 1167-68 (D.C.Cir.2003) (characterizing the act of a car passenger of jumping from the back-seat to the front-seat upon seeing the police as “furtive”).
The furtive conduct of Mr. Dell’s companion included repeated bouts of hesitancy about walking in lockstep with Mr. Dell down the street. More specifically, when Mr. Dell began to immediately walk down the street upon seeing Officer Tafisi, in the same direction the officer was driving, his companion did not do the same. Instead she paused for a “few seconds” before she decided to follow Mr. Dell. Aplt.App. at 69. Shortly thereafter, Officer Tafisi passed by the pair in his squad car, and he could see Mr. Dell and the companion in his rear-view mirror. While Mr. Dell continued to walk in the same direction the patrol car had traveled, his companion again did not act in concert with him, instead she “backtrack[ed]” toward the car, then a “few seconds” later turned back around to follow Mr. Dell. Id. at 70.
There may be many ways to explain this behavior. However, as I have noted, a reasonable officer need not exclude every innocent explanation for an individual’s conduct. Therefore, the majority’s suggestion that “[t]he companion’s conduct was ... even more exculpatory than Mr. Dell’s own conduct,” Maj. Op. at 445 n. 4, does not take us far in the analysis. See United States v. Santos, 403 F.3d 1120, 1125 (10th Cir.2005) (“[T]he Supreme Court has unanimously reversed courts of appeals for overturning district court decisions denying motions to suppress, even when every single factor identified by the officers involved as suspicious was either innocuous or susceptible of an innocent explanation.”). The question is not whether there was a lawful explanation for the companion’s conduct, but rather whether under the totality of the circumstances a reasonable officer could have viewed that conduct as furtive and suggestive of criminal activity. I answer that question in the *458 affirmative. The companion was with Mr. Dell when they were looking into the windows of the vehicle. When Mr. Dell walked away from the vehicle upon seeing Officer Tafisi’s patrol car, it would have been a quite natural reaction for the companion to follow him. But, yet, she did not. More specifically, she appeared to be unable to make up her mind about whether to do so. She vacillated — walking with Mr. Dell in the direction that Officer Tafisi was driving, and then backtracking away from the direction he was driving. Considering all of the factual circumstances, a reasonable officer could have concluded that the somewhat unusual conduct of Mr. Dell’s companion was furtive and suggestive of criminal wrongdoing.
Generally speaking, given the presence of objective indicators of criminal conduct, a reasonable officer could permissibly take action to investigate — not only to confirm but also to dispel — the suspicion that criminal conduct was afoot. See, e.g., Johnson, 364 F.3d at 1195 (noting that the officer “acted just as society would want its law enforcement officers to act when investigating a suspicious situation,” in that he did not do “any more than was necessary to negate or, as it turned out, confirm his suspicions”); United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir.1993) (“Officers may ask the detained individual questions during the Terry stop in order to dispel or confirm their suspicions.... ”).; accord United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir.2008) (“Where a police officer has reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion.”). I consider the totality of the circumstances — including notably Mr. Dell’s reaction in walking away upon seeing Officer Tafisi and his companion’s furtive reactions — as evincing sufficiently particularized and objective indicia of possible criminal conduct, that a reasonable officer, in Officer Tafisi’s position, would have been authorized to conduct a detention to investigate. See United States v. Mireles, 583 F.2d 1115, 1117 (10th Cir.1978) (“[E]ven though a police officer may not have probable cause to make an arrest, he may nonetheless in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior.”); cf. 4 LaFave, supra § 9.5(f), at 528 (explaining that a stronger case for reasonable suspicion can be made where it is likely that a defendant’s reaction in leaving upon seeing the police was “causal” rather than “coincidental” (emphases omitted)). In short, from the perspective of a reasonable officer who is on patrol in a neighborhood that is prone to car break-ins, it would have been eminently reasonable to wonder whether some criminal activity was afoot based on what Officer Tafisi saw. See Arvizu, 534 U.S. at 273, 122 S.Ct. 744.
Ill
For the foregoing reasons, I would hold that the district court erred in granting Mr. Dell’s suppression motion and reverse the court’s order. I would remand the case for further proceedings. Because my esteemed colleagues in the majority reach the obverse conclusion on these matters, I must respectfully dissent.

. The record does not identify Mr. Dell’s companion by name.

. Consistent with the government’s concession, see Aplt. Reply Br. at 2 n. 1 ("The United States has elected not to pursue [a consensual encounter] theory on appeal.”), when Officer Tafisi said, "Hey, come over," and Mr. Dell complied, I assume without deciding that, at that moment, a Fourth Amendment seizure began.

. Only the reasonableness of the initial seizure is at issue in this appeal. Therefore, I have no occasion to assess whether Officer Tafisi’s actions were “reasonably related in scope to the circumstances that first justified the interference.” Cervine, 347 F.3d at 868 (quoting United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.1994)) (internal quotation marks omitted).

. As best that I can discern from my reading of the district court’s order, the district court did not expressly describe Officer Tafisi's beliefs (as the majority does) as "not particularly reliable or probative.” Maj. Op. at 444-45 n. 3; see id. at 445 (asserting that the district court opined that Officer Tafisi’s "beliefs” were "anecdotal in nature, and not particularly probative or persuasive”).